**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *Ex rel.* John M. Williams, Sr., M.D., M.PH., Relator, | Case No.: SA CV 20-0198-CBM-(DFMx) |
| Plaintiff, | |
| v. | **ORDER RE: DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT; AND PLAINTIFF RELATOR'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT** |
| MEDICAL SUPPORT LOS ANGELES, A/K/A MSLA, *et al.*, | |
| Defendants. | |

The matters before the Court are:  1) Defendant Medical Support Los Angeles, Inc. and MSLA Management, LLC's (collectively, "Defendants'") Motion to Dismiss First Amended Complaint ("FAC") (Dkt. No. 24); and 2) Plaintiff Relator John M. Williams, Sr., M.D., M.P.H.'s ("Plaintiff's" or "Relator's") Motion for Leave to File Second Amended Complaint.  (Dkt. No. 69).  The matters are fully briefed.

## I.    BACKGROUND

This is a *qui tam* action brought by John M. Williams, Sr., M.D., M.P.H. (hereinafter, "Relator") arising from Defendants' alleged misrepresentation that they used credentialed examiners (rather than unlicensed MSLA staff) when providing medical exams for veterans seeking disability benefits ("Compensation

and Pension Examinations" or "C&P Exams"), as required by the MSLA's contract with the VA.  The United States filed a notice of its election to decline intervening in this action.  (Dkt. No. 11.)[1]  The Relator filed the FAC as a matter of right, which asserts two causes of action against Defendants:  (1) violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A); and (2) violation of the FCA, 31 U.S.C. § 3829(a)(1)(B).  (Dkt. No. 19.)  Defendants move to dismiss the FAC pursuant to Federal Rules of Civil Procedure 12(b)(6), 8(a), and 9(b).  Plaintiff moves for leave to file a second amended complaint ("SAC").

## II.    STATEMENT OF THE LAW

### A.    Motion to Dismiss

Federal Rule of Civil Procedure 8(a) provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  "False Claims Act plaintiffs must ... plead their claims with plausibility . . . under Federal Rule[] of Civil Procedure 8."  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2004 n.6 (2016); *see also Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) ("A claim under the FCA must . . . be plausible" as required by Rule 8(a)).

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Dismissal of a complaint can be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

---

[1] The Relator has "the right to conduct the action" after the Government elected not to proceed with the action pursuant to 31 U.S.C. § 3730(b)(4)(B) and § 3730(c)(3).

*v. Iqbal*, 556 U.S. 662, 663, (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A formulaic recitation of the elements of a cause of action will not suffice. *Twombly*, 550 U.S. at 555. To conform to Federal Rule of Civil Procedure 8, the plaintiff must make more than "an unadorned, the-defendant-harmed me" accusation. *Iqbal*, 556 U.S. at 678. Labels and conclusions are insufficient to meet the plaintiff's obligation to provide the grounds of his or her entitlement to relief. *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* On a motion to dismiss for failure to state a claim, courts accept as true all well-pleaded allegations of material fact and construes them in a light most favorable to the non-moving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031–32 (9th Cir. 2008). A court may only consider the allegations contained in the pleadings, exhibits attached to or referenced in the complaint, and matters properly subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Rule 9(b) governs all claims sounding in fraud, and requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), Plaintiff must plead facts regarding the "who, what, when, where, and how" of the alleged misconduct. *Godecke*, 937 F.3d at 1208 (citing *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009)). "False Claims Act plaintiffs must ... plead their claims with . . . particularity under Federal Rule[] of Civil Procedure . . . 9(b)." *Universal Health Servs., Inc.*, 136 S. Ct. at 2004 n.6; *see also Godecke*, 937 F.3d at 1208 ("A claim under the FCA must . . . [be] pled with particularity under Rule 9(b)). "Although Rule 9(b) allows [FCA] plaintiffs to allege scienter generally, scienter must still be pled with plausibility under Rule 8(a)." *Adomitis ex. rel. United States v. San Bernardino Mountains Cmty. Hosp.*

1     *Dist.*, 816 F. App'x 64, 66 (9th Cir. 2020) (citing *Iqbal*, 556 U.S. at 686–87).

2    **B.**     **Leave to Amend**

3        Federal Rule of Civil Procedure 15(a) provides "[t]he court should feely

4 give leave" to amend "when justice so requires." Fed. R. Civ. Proc. 15(a).

5 "Requests for leave to amend should be granted with 'extreme liberality.'" *Brown*

6 *v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (citing *Moss v. U.S.*

7 *Secret Serv.*, 572 F.3d 962, 972 (9th Cir. 2009); *Owens v. Kaiser Found. Health*

8 *Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001)). "When considering whether to

9 grant leave to amend, a district court should consider several factors including

10 undue delay, the movant's bad faith or dilatory motive, repeated failure to cure

11 deficiencies by amendments previously allowed, undue prejudice to the opposing

12 party, and futility." *Id.* (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Of

13 these factors, "prejudice to the opposing party carries the most weight." *Id*. (citing

14 *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)).

15             **III.**    **REQUESTS FOR JUDICIAL NOTICE**

16        In connection with their Motion to Dismiss, Defendants request that the

17 Court take judicial notice of the following five government publications which are

18 publicly available on government websites:

19
20        1.     U.S. Government Accountability Office, GAO-13-89, Veterans' Disability Benefits: Timely Processing Remains a Daunting Challenge, 1, 6–9 (2012),
21             https://www.gao.gov/assets/660/651066.pdf.

22        2.     Ordering and Conducting Medical Examinations, Hearing Before the Committee on Veterans' Affairs U.S. House of Representatives, 113th Cong. 113-77 (2014) (statement of
23             Thomas Murphy, Dir. Comp. Serv., Veterans Benefits Administration, US Dep't of Veterans Affairs),
24             https://archives-
25             veterans.house.gov/sites/republicans.veterans.house.gov/files/1 13-77.pdf

26        3.     U.S. Government Accountability Office, GAO-19-13, VA Disability Exams: Improved Analysis and Training Oversight
27             Needed for Contracted Exams, 4 (2018), https://www.gao.gov/assets/700/694986.pdf.
28

4.  U.S. Department of Veterans Affairs, VA Claim Exam Frequently Asked Questions (FAQs), https://www.benefits.va.gov/COMPENSATION/docs/claimexam-faq.pdf; and

5.  U.S. Department of Veterans Affairs, Office of the Inspector General, Audit of VA's Internal Controls Over the Use of Disability Benefits Questionnaires (Feb. 23, 2012), https://www.va.gov/oig/pubs/VAOIG-11-00733-95.pdf.

Defendants also request that the Court take judicial notice of the following in connection with Plaintiff's Motion for Leave to File SAC:

1.  U.S. Department of Veterans Affairs, Office of the Inspector General, Inadequate Oversight of Contracted Disability Exam Cancellations, Report No. 18-04266-115 (June 19, 2019), *available at* https://www.va.gov/oig/pubs/VAOIG-18-04266-115.pdf; and

2.  Exploring VA's Oversight of Contract Disability Examinations, Hearing Before the Subcommittee on Disability Assistance and Memorial Affairs of the Committee on Veterans' Affairs, U.S. House of Representatives, 115th Cong., Serial No. 115-81.

Relator does not object to Defendants' requests for judicial notice, nor challenge the authenticity of the government websites or accuracy of the publications.  Accordingly, the Court **GRANTS** Defendants' requests for judicial notice.  *See* Fed. R. Evid. 201(b); *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 788 (9th Cir. 2018).

## IV.   DISCUSSION

### A.   Motion to Dismiss

Relator's first cause of action asserts Defendants violated 31 U.S.C. § 3729(a)(1)(A) of the FCA, which provides "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" is liable to the United States Government for civil penalties and treble damages.  Relator's second cause of action asserts Defendants violated 31 U.S.C. § 3829(a)(1)(B) of the FCA, which provides "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable to the United States Government for civil

penalties and treble damages. "The essential elements" of a claim pursuant to the FCA are "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1174 (9th Cir. 2006); *see also Godecke*, 937 F.3d at 1208 (identifying same elements for FCA claims). "Material" is defined as something "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Defendants argue Relator's FCA claims must be dismissed pursuant to Rule 12(b)(6) because Relator fails to plead sufficient facts to state a claim for violation of the FCA that is "plausible on its face" as required by Federal Rule of Civil Procedure 8(a) and fails to plead his claims pursuant to the FCA with sufficient particularity as required by Rule 9(b).

Here, Relator's FCA claims are based on three alleged "key tasks" (FAC ¶ 22) which Relator contends were performed by MSLA staff instead of credentialed examiners as allegedly required by MSLA's contract with the VA:

1.   review of the veteran's medical records provided by the VA which often included the "entire case file or C-file" (*id*. ¶¶ 18; 22);

2.   ordering any additional testing of the veteran (*id*. ¶¶ 19, 22); and

3.   editing medical reports of examinations (*id*. ¶¶ 19, 22).[2]

The FAC alleges MSLA knowingly submitted to the VA thousands of C&P Examination reports and then submitted requests to the VA for payment for such reports, which MSLA "falsely represented . . . as having been prepared entirely by a properly-credentialed physician as required by the VA." (*Id*. ¶ 23.) The FAC

---

[2] MSLA's contracts with the VA were not attached to the FAC and were not provided by the parties with their original briefing on the Motion. Defendants subsequently filed copies of the contracts and the parties identified the relevant portions of the contracts for purposes of the Motion as ordered by the Court. (*See* Dkt. Nos. 39, 43, 53.)

also alleges MSLA "knowingly submitted false claims" to the VA for "performance"/"paid incentive bonuses" for completing exam reports "faster than required/expected and for achieving higher than required/expected 'quality' scores on the reports submitted" but "MSLA was able to submit reports to the VA so quickly only because MSLA improperly allocated functions that were required to be performed by properly-credentialled examiners to various MSLA employees MSLA knew were not properly-credentialled" and "then fraudulently misrepresented to the VA that the examination reports had been completed by properly-credentialed examiners." (*Id*. ¶ 24.)

**(1)    Review of Medical Records**

The first "key task" which Relator alleges was performed by MSLA staff, instead of credentialed examiners as allegedly required by MSLA's contract with the VA, is the review of the veteran's medical records provided by the VA which allegedly often included the "entire case file or C-file." (FAC ¶¶ 18, 22.) The FAC alleges "[p]rior to the examinations, portions of the veterans' records that had been provided by the VA (the VA would have often provided the entire C-file as being necessary for the exam) were cherry-picked by people lacking the required credentials and not by the examiner whose electronic signature would be affixed by MSLA to the final report," and therefore the credentialed examiner "was not provided all of the veteran's medical records that had been deemed relevant for review of the claim by the VA." (*Id*. ¶ 50.a.) The FAC alleges MSLA "falsely represented" in examination reports it submitted to the VA "that the veterans' claim file and medical records had been reviewed by properly-credentialed examiners." (*Id*.)

A prior version of Section 9.12 of the VA contract stated:

> The Contractor shall provide physician(s) with a copy of the Veteran's or Servicemember's medical records, ***if applicable or required*** by VA, prior to the examination in a secure, electronic manner. ***If applicable***, the Contractor shall scan the entire contents of the claims file to be transmitted to the physician(s) electronically.

(Dkt. No. 39-2 at 16 (emphasis added).  Section 9.12 was amended on September 21, 2016 to remove the "if applicable or required" language from Section 9.12. Now, Section 9.12 of the VA contract ("Veteran and/or Servicemember Files") provides:

> Contractor shall scan ***the entire claims folder*** from VBMS, with the exception of the documents noted below, which shall be made available to the medical professional conducting the examination in a secure, electronic manner. The examiner's review is not limited to the evidence identified by VBA (i.e., tabbed evidence).

(Dkt. 39-3 at pp. 1752-54 (emphasis added).)  Relator argues, citing to Section 9.12, that the contracts were amended to require the entire claims file to be sent to the examiner.  Relator contends the contracts never suggested MSLA's staff could pick and choose from among the records in the claim folder sent by the VA and determine which records to make available to the examiner.

MSLA's alleged failure to provide the examiner with the entire claims file as required by Section 9.12 of the contracts is a contractual dispute that is not cognizable under the FCA.  *See Cafasso*, 637 F.3d at 1057 (noting contract claims "are not the same as fraudulent conduct claims, and the normal run of contractual disputes are not cognizable under the FCA," and holding Cafasso asserted a breach of contract claim based on contractual disputes which was not cognizable under the FCA, reasoning "Cafasso's allegations that GDC4S did not comply with ATIRP's disclosure requirements, and that GDC4S received payment from the United States pursuant to ATIRP, in essence fault GDC4S for allegedly breaching its contractual obligations" which is "not the same as fraudulent conduct claims" as required under the FCA) (citing *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 383 (4th Cir. 2008)).[3]

---

[3] Relator argues the Supreme Court has stated "liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement."  (Opp. at 18 (quoting *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1995 (2016)).)  However, as Defendants contend, Relator's conclusory allegations in the FAC that MSLA falsely represented that licensed examiners were reviewing

Therefore, the Court dismisses Relator's FCA claims based on MSLA staff's alleged review of medical records with leave to amend.

**(2)   Ordering Tests**

The second "key task" which Relator alleges was performed by MSLA staff, instead of credentialed examiners as allegedly required by MSLA's contract with the VA, was the ordering of any additional testing of the veteran.  (FAC ¶¶ 19, 22.)  The FAC alleges:

1.   "Diagnostic tests for veterans were determined and ordered by people lacking the required credentials and not the examiner whose electronic signature would be affixed by MSLA to the final report." (*Id.* ¶ 50.b);

2.   "MSLA employees ordered diagnostic tests for the veteran soon after receiving the case from the VA, before the veteran ever saw the examiner, and often before and without regard to a proper review of the veteran's existing records to see if a test was necessary or if it had been performed" (*Id.*);

3.   "Oftentimes, such tests would have already been performed by third-party labs and diagnostic facilities prior to the examiner seeing the veteran" (*Id.*);

4.   "[S]ometimes the results of these tests would be reported to MSLA after the examiner had completed his or her examination and report, and thus were never reviewed or seen by the examiner." (*Id.*);

5.   MSLA "falsely represented" in the examination reports submitted to the VA "that diagnostic tests for the veteran had been ordered, performed, and reviewed by the examiner whose signature and credentials were provided to VA." (*Id.*)

6.   MSLA's CMO told Relator that labs and tests were "scheduled" by MSLA in advance of the veteran seeing a credentialed examiner, but MSLA did not consider this an 'order'" and Dr. Sonny told Relator during his visit to MSLA offices on November 8-10, 2017 that she did not order any tests (*id.* ¶ 74); and

7.   MSLA personnel told Relator during a meeting at MSLA's Pasadena office on November 10, 2017, that tests were "routinely 'scheduled' in advance" of the examination and the examiner could "'opt out' if they did not want a 'scheduled' test to be performed." (*Id.* ¶ 75.)

_____

all medical records is undermined by the fact that MSLA's processes were included in PowerPoints, workflow documents, and "FAQs." (FAC ¶¶ 60-64, 90.)

Defendants argue the documents cited in the FAC show MSLA staff was scheduling tests and not ordering test (*id.* ¶¶ 61-63), and the FAC acknowledges scheduling exams was MSLA's responsibility, not the responsibility of the credentialed examiner (*id.* ¶ 38 (alleging "the contractor [i.e., MSLA] also coordinated the scheduling of the exams")).  In response, Relator contends the contracts provide the following with respect to scheduling tests:  "If the Examination Worksheet or DBQ, as applicable, requires an examiner to conduct an examination of a Veteran to determine suitability for a particular diagnostic test, then the contractor *shall not schedule such diagnostic test prior to the Veteran's examination* unless preauthorized by the requesting facility."  *See* Section 9.22 (Dkt. No. 39-2 at p. 19 (emphasis added)).  However, Defendants argue the FAC acknowledges such scheduling was only prohibited "if the C&P Worksheet for a particular examination required the physician examiner to conduct an examination of a Veteran or service member" prior to a "particular diagnostic test" (FAC ¶ 108), and the FAC does not allege MSLA was scheduling tests under those circumstances or that MSLA received referrals for those types of exams.

The DBQs and the contracts listed ancillary tests required by the VA for an adequate exam report, and the contracts provided that "[a]ll test and procedures specifically required in the examination worksheets shall be conducted unless not medically advisable or declined by the individual examined."  (Gonzales Decl. ¶ 3, Ex. A (Dkt. No. 39-1 at 24, 102, 146).)  A list of diagnostic tests associated with each examination were attached to the contracts, and the VA required medical examiners to document the reasons for failing to perform a required test and obtain a waiver from veterans if the test was declined.  (Gonzales Decl. ¶¶ 3-4, Ex. A (Dkt. No. 39-1 at 78-86, 374); Ex. B (Dkt. 39-2 at 20).)  The FAC does not allege tests were being conducted that were not medically advisable or that were declined by individuals being examined, or that tests were being scheduled where

a waiver had been obtained from the veteran who declined to undergo the test. Moreover, the FAC alleges the VA reviewed whether "proper tests, procedures, laboratory work, and x-rays [were] utilized" as part of its quality ratings and MSLA had 98% quality scores which exceeding VA's 92% quality standards. (*See* FAC ¶¶ 67, 72 n.15, 75.)  Therefore, the FAC does not allege sufficient facts regarding whether Defendants were ordering/scheduling tests prior to the examination which violated the contracts.

Furthermore, Relator "in essence fault[s] [Defendants] for allegedly breaching its contractual obligations" to not preschedule testing before examinations by the licensed examiner unless preauthorized by the requesting facility to the extent the Examination Worksheet or DBQ required an examiner to conduct an examination of a Veteran to determine suitability for a particular diagnostic test, which is "not the same as fraudulent conduct claims" as required under the FCA.  *See Cafasso*, 637 F.3d at 1057.[4]

Therefore, the Court dismisses Relator's FCA claims based on MSLA staff allegedly ordering/scheduling tests with leave to amend.

### (3)   Editing Examination Reports

The third "key task" which Relator alleges was performed by MSLA staff, instead of credentialed examiners as allegedly required by MSLA's contract with the VA, was the editing of medical reports of examinations.  (FAC ¶¶ 19, 22.) The FAC alleges:

> 1.   "[E]xamination reports prepared by examiners were not 'locked' after the examiners submitted the work on the reports to MSLA" and therefore "the reports ***could be*** and were changed by people lacking the required credentials and not the examiner whose electronic signature would be affixed to the final report."  (*Id*. ¶ 50.c (emphasis added));

---

[4] Moreover, Relator's conclusory allegations in the FAC that MSLA falsely represented that licensed examiners were ordering/scheduling tests is undermined by the fact that MSLA's processes were included in PowerPoints, workflow documents, and "FAQs."  (FAC ¶¶ 60-64, 90.)

2.    For "example," "sometimes test results were added to reports after the examiner had submitted the examination report to MSLA and concluded his or her work on the case" because "[t]he reports were reviewed by people other than the examiner and if any changes were deemed necessary or appropriate, for whatever reason, by these other people, then changes were made to the reports without the approval or knowledge of the examiner."[5]  (*Id.*); and

3.    MSLA falsely represented examination reports "were the product of the examiner whose signature and credentials were provided to the VA" when "[i]n reality, reports were 'finalized' by MSLA employees who lacked the required credentials and who did not actually perform the examination."  (*Id.*)

While the FAC alleges "reports ***could be*** and were changed by people lacking the required credentials and not the examiner whose electronic signature would be affixed to the final report" (FAC ¶ 50.c (emphasis added)), the FAC does not allege facts about specific reports that were edited, when those reports were edited, by whom, or the content of the edits.  *See* Fed. R. Civ. P. 9(b); *Godecke*, 937 F.3d at 1208 (the plaintiff must allege the who, what, where, when of the fraud to satisfy Rule 9(b)); *Cafasso*, 637 F.3d at 1057-58 (a complaint brought for violation of the False Claims Act which "identifies a general sort of fraudulent conduct but specifies no particular circumstances of any discrete fraudulent statement" fails to meet Rule 9(b)'s heightened pleading standards, and "unsavory conduct is not, without more, actionable under the FCA," reasoning "[i]t is not enough ... 'to describe a [fraudulent] scheme in detail but then to allege simply and without any stated reason ... that claims requesting illegal payments must have been submitted.'") (citing *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001)).[6]  Moreover, in contrast to Relator's conclusory allegation

---

[5] The FAC does not allege specific facts about this "example" or include the factual basis for this allegation.

[6] *Cf. Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1120 (9th Cir. 2020), *cert. denied sub nom. Rollinsnelson LTC Corp. v. U.S. ex rel. Winters*, 2021 WL 666435 (U.S. Feb. 22, 2021) (finding the complaint was "not a complaint that identifies a general sort of fraudulent conduct but specifies no particular circumstances of any discrete fraudulent statement" because the complaint identified 65 allegedly false claims "in great detail, listing the date of admission, the admitting physician, the patient's chief complaint and

that reports were edited after the examiner's report was submitted, the FAC also alleges Dr. Sonny, MSLA's Chief Medical Officer ("CMO"), told Relator during his visit to MSLA offices on November 8-10, 2017, that she "never changed, edited or altered an exam report after a contract examiner had submitted it."  (FAC ¶ 74.)  Therefore, the FAC fails to plausibly allege fraud with specificity as required by Rule 9(b) based on the alleged editing of examination reports by unlicensed MSLA employees.

The FAC also alleges Mr. Scarpiello, MSLA's former Director of Business Development, made allegations in a breach of contract lawsuit in 2018 which are "consistent with what [Relator] observed and determined in the course of his own investigation of MSLA," and that Scarpiello "has further knowledge that will directly corroborate the claims asserted by Relator."  (*Id*. ¶ 85.)[7]  However, the FAC's allegations regarding Scarpiello's allegations in his breach of contract lawsuit cannot be a basis for stating a claim for fraud based on MSLA staff allegedly editing examination reports without the examiner's knowledge because Relator does not attest that he independently examined the materials underlying Scarpiello's allegations or contacted Scarpiello's attorneys or Scarpiello himself.  *See* Fed. R. Civ. P. 11; *Geinko v. Padda*, 2002 WL 276236, at *6 (N.D. Ill. Feb. 27, 2002) (plaintiffs could not recite allegations made in other third party complaints to allege facts sufficient to state a claim for fraud because the plaintiffs "do not attest to independently examining the materials underlying these third-party allegations; they did not contact the attorneys for the plaintiffs in these

_____

diagnosis, and the amount billed to Medicare," and alleged "each admission failed to satisfy the hospital's own admissions criteria" which Gardens Regional and Dr. Pascual had contractually agreed to use and that Winter's job as Director of Care Management required her to apply).

[7] Specifically, the FAC alleges that Scarpiello alleged in his breach of contract lawsuit against MSLA that MSLA and/or MSLA management "were improperly processing veterans' diagnostic tests," and "would add the findings [from diagnostic tests] to the already complete/signed medical report without examining provider's knowledge, thus making it seem as if the provider had reviewed the report."  (FAC ¶ 84.)

actions or the witnesses quoted," and "if this Court were to accept Plaintiffs' view of pleading fraud, two plaintiffs could file separate actions each relying on the allegations in the other's complaint and both would state a claim for fraud," but "[c]learly, Rule 11's requirements do not allow this type of pleading loophole").[8]

Relator also argues he states a claim under the FCA based on the editing of examination reports by non-credentialed MSLA staff because the VA required that the entire C&P Exam, not just a "physical exam," be completed by properly credentialed examiners, and therefore the exam reports produced by MSLA were "worthless" to the VA and/or were "nonconforming goods." Relator relies on the following contractual provisions in arguing MSLA staff's editing of examination reports violated the contracts:

- Section 10.12 ("Examiner Credentials and Signature") provides: Completed examination reports shall include the examiner's credentials (e.g. MD, NP, PA, etc.), specialty (internal medicine, family practice, neurologist, etc.) and signature in accordance with requirements of examination. The examiner's credentials shall be included in the signature block. The person signing the examination shall be the person who conducted the examination. The examiner shall include on the DBQ both their state license number and their National Provider Identifier (NPI) to be included in either the signature or remarks section of the DBQ. (Dkt. No. 39-4 at 123.)

- Section 10.13 ("Complete Reports") provides: The Contractor shall ensure that examination reports are adequate and in compliance with the examination request worksheets with review of test results by examiners documented, and any discrepancies resolved. (Dkt. No. 39-3 at 1763.)

There is no allegation in the FAC that the examiner's credentials were missing from the examination reports. Instead, Relator relies on these contract provisions in arguing the contracts did not permit MSLA staff to edit examination reports. However, Section 10.12 and 10.13 do not prohibit MSLA staff from editing reports, and instead provide that the person signing the examination report shall be

---

[8] *See also In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1006 (N.D. Cal. 2008); *In re Apollo Grp., Inc. Sec. Litig.*, 2011 WL 5101787, at *10 n.5 (D. Ariz. Oct. 27, 2011).

1    the credentialed examiner who performed the examination.  The FAC does not

2    allege anyone else other than licensed examiners conducted the actual examination

3    of patients and signed the reports.

4          Relator also relies on *Vatan v. QTC Med. Servs., Inc.*, 812 F. App'x 485

5    (9th Cir. 2020), in support of his contention that MSLA's exam reports were

6    worthless.  In *Vatan*, the Ninth Circuit recognized that "[i]n an appropriate case,

7    knowingly billing for worthless services" may be actionable.  *Id*. at 487 (quoting

8    *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th

9    Cir. 2001)).  However, the Ninth Circuit in *Vatan* held summary judgment in favor

10   of the defendant on a FCA claim was proper where "[a]ll of the record evidence

11   suggests that the VA was not only pleased with the work QTC did, but that it had

12   no complaints whatsoever," the relator offered no evidence to suggest that anyone,

13   at the VA or QTC, thought that QTC's performance was deficient," and the relator

14   "ha[d] not identified a single file that received an inaccurate referral decision nor

15   has he shown that the review was so plagued with inaccuracies that QTC's

16   performance amounted to essentially no performance at all."  *Id*. at 487 & n.3.

17   Here, the FAC does not allege the VA found any of the examination reports to be

18   deficient or inaccurate.

19         As to a nonconforming services claim under the FCA, a plaintiff must

20   either:  (1) identify representative examples of false claims to support every

21   allegation or (2) allege particular details of a scheme to submit false claims

22   "paired with reliable indicia that lead to a strong inference that [false] claims were

23   actually submitted."  *Ebeid*, 616 F.3d at 998–99.  While the FAC alleges a general

24   scheme of fraudulent conduct, the FAC does not allege particular circumstances of

25   any specific exam or report for which MSLA submitted a false claim.  A

26   complaint brought for violation of the FCA which "identifies a general sort of

27   fraudulent conduct but specifies no particular circumstances of any discrete

28   fraudulent statement" fails to meet Rule 9(b)'s heightened pleading standards.  *See*

*Cafasso*, 637 F.3d at 1057-58 (citing *Bly-Magee*, 236 F.3d at 1018).[9]  Therefore, because the FAC does not allege any false claims in any specific detail nor identify any representative examples of false claims, Relator fails to state a claim for violation of the FCA based on nonconforming services in connection with MSLA staff allegedly editing reports.[10]

Accordingly, the Court dismisses Relator's FCA claims based on MSLA staff allegedly editing reports with leave to amend.

### (4)    Implied False Certification Theory

Alternatively, Relator argues the FAC's allegations support MSLA's liability under an implied false certification theory because when MSLA submitted requests for payment, it impliedly certified "compliance with all conditions of payment" and knowingly failed to disclose "violation of a material . . . contractual requirement"— "*i.e.,* examinations and reports must be completed by qualified examiners."

For an FCA claim brought under an implied certification theory, the relator must allege that the claim "(1) makes specific representations about the goods or services provided"; and (2) Defendants' "failure to disclose noncompliance with **_material_** statutory, regulatory, or contractual requirements that made those representations misleading half-truths."  *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1989 (2016) (emphasis added); *see also United States Ex Rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1018 (9th Cir. 2018) (adopting *Escobar's* two requirements for implied false certification cases).  "[H]alf-truths—

---

[9] *Cf. Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1120 (9th Cir. 2020), *cert. denied sub nom. Rollinsnelson LTC Corp. v. U.S. ex rel. Winters*, 2021 WL 666435 (U.S. Feb. 22, 2021).

[10] Moreover, Defendants again contend Relator's conclusory allegations in the FAC that MSLA falsely represented that licensed examiners were completing the editing of reports is undermined by the fact that MSLA's processes were included in PowerPoints, workflow documents, and "FAQs."  (FAC ¶¶ 60-64, 90.)  Relator does not respond to the fact that Defendants' process of having its staff edit reports was disclosed.

representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations" under the implied false certification theory.  *Universal Health Servs., Inc.*, 136 S. Ct. at 2000.

"[N]ot every undisclosed violation of an express condition of payment automatically triggers liability" and "contractual requirements are not automatically material, even if they are labeled conditions of payment."  *Id*. at 2001.  Rather, "[w]hether a provision is labeled a condition of payment is relevant to but not dispositive of the materiality inquiry."  *Id*.; *see also id*. at 2003 ("[T]he Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive.").  "[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be ***material*** to the Government's payment decision in order to be actionable under the False Claims Act."  *Id*. at 2002 (emphasis added).  "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *Id*. (citations omitted).  "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance."  *Id*. at 2003.  "Materiality, in addition, cannot be found where noncompliance is minor or insubstantial."  *Id*.  "For a false statement to be material, a plaintiff must plausibly allege that the statutory violations are so central to the claims that the government would not have paid these claims had it known of these violations."  *Winter*, 953 F.3d at 1121 (internal quotations and citations omitted).  "[P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement."  *Universal Health*

*Servs., Inc.*, 136 S. Ct. at 2003.  "Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated," or "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id*. at 2003-04.

Relator cites to various cases in support of his contention that Defendants' alleged failure to disclose the fact that non-credentialed examiners were performing the three "key tasks" (i.e., review of medical records, ordering tests, and editing examination reports) was material and the government would not have paid for the claims had it known MSLA staff were performing those "key tasks." However, each of the cases cited by Relator involves a physical exam, test, procedure, or treatment given to patients by unlicensed individuals—and do not involve similar administrative tasks at issue in this case such as initially reviewing records, ordering tests, or editing reports.[11]

---

[11] *Cf. U.S. ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 108 (1st Cir. 2016) (parents, as relators, brought qui tam suit against healthcare provider under the FCA who made material misrepresentations regarding regulatory compliance in Medicaid claims after their daughter died of a seizure when she was being treated at a mental health clinic by various unlicensed and unsupervised staff in violation of state Medicaid regulations); *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 373 (5th Cir. 2004) (FCA claim based on defendants allegedly performing unnecessary heart transplants and making claims for services by a doctor who had not passed the Texas licensing exam); *United States v. Mackby*, 339 F.3d 1013, 1015 (9th Cir. 2003) (alleging defendant, who was not a physician nor a licensed physical therapist, billed Medicare for therapy under his father's identification number even though his father, a doctor, did not provide services or know his son was using his identification number); *U.S. ex rel. Taylor v. Boyko*, 2019 WL 2423283 at *6 (S.D. W.Va. June 7, 2019) (alleging Medicare was billed for physician's services even though the patient was never seen by a physician and the physician admitted that he completed forms to ensure reimbursement at full physician rate); *United States v. Somnia, Inc.*, 2018 WL 684765 at *2 (E.D. Cal. Feb. 2, 2018) (alleging defendant made claims for doctor-directed services even though doctor was away from the premises, playing golf, and could not be reached at the time); *U.S. ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 311 (3d Cir. 2019) (Defendant's false representations to Medicare that the neurological testing being performed at her husband's healthcare company was being supervised by a licensed neurologist satisfied materiality element of government's claim against her under the FCA).

Relator also argues "the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular … contractual requirement."  Relator relies on the September 2016 Amendments to the contracts which added a new provision to Section 15.13 which provides:

> In the event the vendor discovers that examinations have been conducted by a provider that is not properly, licensed and trained (Inadequate Provider), the vendor shall cease to use the provider immediately and notify the COR within the same business day. The vendor shall provide the COR with a list of all examinations conducted by the inadequate provider during the time their license or training was not in accordance with the terms of the contract. At the request of VBA, the vendor shall re-examine Veterans at no cost to VBA. The vendor shall also return any amounts paid for the examination to VBA. Due to the amount of rework required and the inconvenience to both the Veteran and VBA, VBA may consider assessing a penalty up to $1,000/per examination by an Inadequate Provider and at the discretion of the Contracting Officer.

(Dkt. No. 39-3 at pp. 1778-79).  However, the FAC does not allege plausible facts demonstrating these three "key tasks" are part of the "examinations" that the VA required to be performed by licensed examiners or that these tasks were so "central to the claims that the government would not have paid these claims had it known of these violations."  *Winter*, 953 F.3d at 1121.  Neither the FAC nor Relator cites to any statutes or regulations requiring the three "key tasks" to be performed by licensed examiners.[12]  Thus, the FAC does not plausibly allege the government would not have paid Defendants' claims had it known MSLA staff was allegedly performing the three "key tasks."  Therefore, the FAC fails to allege

---

[12] *Cf. Winter*, 953 F.3d at 1121-22 (finding "false certification of medical necessity can be material" and concluding Winter's allegations which highlighted Medicare statutes and regulations that provide that Medicare pays for inpatient hospitalization "*only if* ... such services are required to be given," and allegations that the government "would not" have "paid" Defendants' false claims "if the true facts were known," were sufficient allegations that "Defendants' false certification of the medical necessity requirement is 'so central' to the Medicare program that the government 'would not have paid these claims had it known' that the inpatient hospitalizations were, in fact, unnecessary."); *United States Ex Rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1020 (9th Cir. 2018) ("A reasonable trier of fact could find materiality here because the Department's payment was conditioned on compliance with the incentive compensation ban, because of the Department's past enforcement activities, and because of the substantial size of the forbidden incentive payments.").

facts demonstrating Defendants' alleged falsification that such tasks were being performed by licensed examiners are "material" to state a claim under the FCA.

Accordingly, the Court dismisses Plaintiffs' FCA claims to the extent they are based on an implied false certification theory with leave to amend.

**B.    Leave to File Second Amended Complaint**

Plaintiff's Motion seeks leave to file a Second Amended Complaint.[13]

**(1)    Undue Delay, Bad Faith, and Undue Prejudice**

Defendants do not argue Relator unduly delayed in seeking leave to amend, that Relator engaged in bad faith, or that Defendants will suffer undue prejudice if Relator is given leave to amend.  Therefore, these factors do not weigh against granting leave to amend.

**(2)    Failure to Cure Deficiencies by Amendments Previously Allowed**

The Proposed SAC adds allegations in support of a new claim for fraudulent inducement under the FCA.  Therefore, this factor does not weigh against granting Plaintiff leave to amend to assert this new claim.

**(3)    Futility**

Relator argues the Proposed SAC includes a new claim for fraudulent inducement under the FCA and allegations in support thereof arising from Defendant MSLA's alleged false representation that it had the capacity to provide sufficient properly-credentialled examiners to meet the VA's demands and that it would comply with VA requirements for the examinations and reports to be completed by such properly credentialled examiners which allegedly induced the VA to award contracts to MSLA.  (*See* proposed SAC ¶¶ 8, 21, 120-38, 153-59.) Defendants contend the Proposed SAC would be futile because 1) the capacity allegations are substantially the same as those publicly disclosed by the Veterans Affairs Office of Inspector General ("OIG") and in a congressional hearing, and

---

[13] Plaintiff submitted a proposed Second Amended Complaint (hereinafter, "Proposed SAC") in support of his Motion.

Relator is not the original source of them; (2) the OIG investigated and explicitly found that MSLA's capacity issues did not involve any fraud; and (3) Relator, who was a stranger to MSLA until years after the contracts were awarded, cannot plausibly or specifically plead allegations regarding MSLA's promises or intent at the time of the contract bids.

"While courts will determine the legal sufficiency of a proposed amendment using the same standard as applied on a Rule 12(b)(6) motion, such issues are often more appropriately raised in a motion to dismiss rather than in an opposition to a motion for leave to amend." *Saes Getters S.P.A. v. Aeronex, Inc.*, 219 F. Supp. 2d 1081, 1086 (S.D. Cal. 2002).[14]  Because the Court has not previously ruled on the merits of a fraudulent inducement claim under the FCA and Realtor did not have the benefit of this Order when preparing the Proposed SAC, the Court grants Plaintiff's Motion for leave to file a Second Amended Complaint.  *See* Fed. R. Civ. Proc. 15; *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) ("[A] district court must give plaintiffs at least one chance to amend a deficient complaint, absent a clear showing that amendment would be futile.").

## V.   CONCLUSION

Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss First Amended Complaint with leave to amend, and **GRANTS** Relator's Motion for Leave to File Second Amended Complaint.

To the extent Plaintiff seeks to plead additional facts to correct the deficiencies as to Plaintiff's existing FCA claims for which the Court has given leave to amend in this Order, those allegations should be included in the Second Amended Complaint.  Relator shall file the Second Amended Complaint **no later than December 10, 2021**, and a failure to file the Second Amended Complaint by

---

[14] *See also Clarke v. Upton*, 703 F. Supp. 2d 1037, 1043 (E.D. Cal. 2010).

1   that date shall result in dismissal of Plaintiff's claims with prejudice.

2

3        **IT IS SO ORDERED.**

4

5   DATED:  November 29, 2021.

6                                   _____
                                    CONSUELO B. MARSHALL
7                                   UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28