JAMES CRAIG ORR, JR. (*pro hac vice*)
jim@hop-law.com
CHARLES MILLER, ESQ./SBN: 276523
charles@hop-law.com
**HEYGOOD, ORR & PEARSON**
6363 North State Highway 161
Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002

**Attorneys for Relator**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,   )<br>*Ex rel.* John M. Williams, Sr.. M.D., )<br>M.P.H., Relator, )<br><br>Plaintiffs, )<br> )<br> )<br> )<br> )<br> )<br>vs. )<br> )<br>MEDICAL SUPPORT LOS )<br>ANGELES, A MEDICAL )<br>CORPORATAION, A/K/A MSLA; )<br>MSLA MANAGEMENT, LLC )<br> )<br>Defendants. )<br> )<br> ) | **CASE NUMBER:**<br>**8:20-cv-00198-CBM-DFM**<br><br>**SECOND AMENDED COMPLAINT**<br>**[REDACTED] FOR:**<br><br>**1. VIOLATION OF THE**<br>**FEDERAL FALSE CLAIMS ACT,**<br>**31 U.S.C § 3729(a)(1)(A)**<br><br>**2. VIOLATION OF THE**<br>**FEDERAL FALSE CLAIMS ACT,**<br>**31 U.S.C. § 3729(b)(1)(B)**<br><br>**3. VIOLATION OF THE**<br>**FEDERAL FALSE CLAIMS ACT**<br>**BY FRAUD IN THE INDUCEMENT** |

The United States of America, by and through qui tam Relator, John M. Williams, Sr.,

M.D., M.P.H., brings this action under 31 U.S.C. Sections 3729-32 (the "False Claims Act") to

recover from Defendants for all damages, penalties and other remedies available under the False

Claims Act on behalf of the United States and himself and would show unto the Court the following:

## I.        Parties

1.        Plaintiff, JOHN M. WILLIAMS, SR., M.D., M.P.H. ("Dr. Williams") is an individual who resides in Colorado Springs, Colorado.  He is a citizen of the State of Colorado.

2.        MEDICAL SUPPORT LOS ANGELES, A MEDICAL CORPORATION, *a/k/a* MSLA ("MSLA") is a California corporation.  Its principal place of business is in Cypress, California. MEDICAL SUPPORT LOS ANGELES, A MEDICAL CORPORATION, *a/k/a* MSLA has been served with process and is before the Court for all purposes.

3.        MSLA MANAGEMENT, LLC (hereinafter sometimes referred to as "MSLA Mgmt") is a Delaware limited liability company.  Its principal place of business is in Cypress, California.  MSLA Mgmt. has been served with process and is before the Court for all purposes. Since March of 2016, MSLA Mgmt. has been the sole and exclusive manager of the business, operations, and all non-medical activities of MSLA with full responsibility and authority to operate and manage the day-to-day aspects of such activities of the MSLA.  For the time period from March 2016 to the present, references herein to "MSLA" are to both Medical Support Los Angeles, a Medical Corporation, and MSLA Mgmt.

## II.        Jurisdiction and Venue

4.        This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

5.        Venue and jurisdiction is proper in this Court under 31 U.S.C. § 3732(a) because this is a judicial district in which any one defendant can be found, resides, transacts business, and/or in which an act proscribed by § 3729 occurred.  Throughout the years material herein,

Defendants maintained operations in Pasadena in Los Angeles County and as a result, as detailed throughout this complaint, an act proscribed by § 3729 occurred in Los Angeles County.

6. There have been no public disclosures of the allegations or transactions contained herein that bar jurisdiction under 31 U.S.C. § 3730(e). In accordance with 31 U.S.C. § 3730(b)(2), Relator served the United States with the original complaint pursuant to Federal Rule of Civil Procedure 4. Relator will also serve this amended complaint on the United States.

### III.    Introduction

7. MSLA contracted with the VA to provide "Medical Disability Examinations" (MDEs). As the VA is itself under a legal obligation to assist veterans and servicemen seeking disability benefits by helping them obtain qualified medical opinions on the areas relevant to such claims, the VA in turn imposed specific requirements on MSLA as to who could be an examiner and as to what constituted an MDE, including that a properly-credentialled health care professional was to review the claimant's claim file (including service records and medical records), conduct an in-person exam of the veteran, order additional tests if necessary and review the results of any such tests, and prepare and sign a report documenting their work. The VA required the licensed and trained examiner to sign the final report himself or herself and to indicate the credentials that qualified him or her to conduct that particular MDE.

8. Although the word "examination" can lead to confusion in this context, a MDE is not a typical medical examination for treatment purposes and, significantly, an MDE is not merely an in-person medical examination. Rather, an MDE is a forensic examination that is, as the VA puts it, more properly thought of as a "medical review" that is to be conducted by a properly-credentialled health care professional. For instance, a significant part of an MDE is a review of the veteran or servicemember's file by a properly-credentialled health care professional. Indeed,

without such a file review by the same properly-credentialled health care professional who then conducts the in-person exam and completes the final report, any such in-person exam and final report will necessarily fail to satisfy not only the VA's requirements under the contracts with MSLA that are at issue but also the VA's legal obligations to such claimants.

9.     The primary contract deliverable for MSLA was reports of MDEs that were the work of properly-credentialled examiners.

10.     The VA did not and would not knowingly accept and pay for MDEs that were not in fact the work of properly-credentialled examiners.

11.     To provide a disability examination that was not actually conducted by a properly-credentialled health care professional, as required, is to provide to the VA something that is not only not an MDE, but also something that is worthless to the VA.

12.     If the VA had been aware that non-delegable components of the MDE had been improperly delegated to unqualified individuals (without even oversight or involvement of the person whose digital signature and credentials were the only  signature and credentials listed on the report), the VA would have deemed  them as worthless, and needing to done again and in such a manner that would comply with the VA's legal obligation to provide veterans with MDEs performed by properly-credentialled examiners.

13.     To properly perform the contracts, MSLA would have had to subcontract with a huge number of qualified physicians.   As it turned out, however —and rather than offer would-be examiners enough compensation (*i.e.*, share enough of what it was to be paid by the VA) to lure and retain sufficient qualified examiners to do work the VA required be performed by properly-credentialled medical professionals—MSLA decided it would be cheaper, easier and quicker (*i.e.*, more profitable for MSLA) to have unqualified MSLA employees secretly control and perform

significant aspects of the MDEs, and then defraud the VA by making the VA believe all of the necessary work to conduct the MDEs had been performed by properly-credentialled examiners.

14.     As detailed in this complaint, MSLA fraudulently induced the VA to award contracts to MSLA for MDEs. Then, after being awarded the contracts, MSLA submitted false claims to the VA for payment (and for bonuses).

15.     As will be detailed, to save time and money, MSLA improperly delegated critical, non-delegable components of the MDEs to MSLA employees who did not possess the credentials required by the VA.  MSLA then defrauded the VA by attaching electronic signatures of licensed physicians to the final reports submitted to the VA (making it appear to the VA that the reports were what the VA required and paid for) even though those physicians had been excluded from, and were unaware of, much of what had transpired at MSLA as to the MDEs in question. As a result, and instead of MDEs completed by properly-credentialled health care professionals (*i.e.*, what the VA required and paid for), MSLA provided fraudulent and worthless reports that misleadingly appeared to the VA be the work of  properly-credentialled examiners (as required by the VA), but were not.

16.     The entire point of MSLA's scheme was to make the examination reports it submitted ***appear*** to satisfy the VA's requirements. And, because MSLA's reports appeared proper on their face, VA did was not able to, and did not, find any of the reports to be deficient or inaccurate.   In fact, because of MSLA's fraud, the VA had no way of knowing the reports were not the MDEs requested.

17.      Relator, Dr. Williams, is a licensed, board-certified physician, as well as a combat veteran and retired medical officer of the United States Navy. He has dedicated much of his medical career in service to veterans and military members.

18.     Dr. Williams holds active board certification in the specialty of Occupational Medicine (through the American Board of Preventive Medicine) as well as experience in personally performing and supervising other VA-employed physicians, behavioral health, audiology and physician-extender personnel performing numerous detailed Compensation and Pension exams on veterans as a VA Medical Director in charge of an Integrated Disability Evaluation System clinic (2009-2010). He has been on the "other side" of the exam table as a veteran undergoing VA Compensation and Pension exams and is intimately familiar with the processes both as an examiner and as a veteran.

19.     Presumably because of his reputation, experience and expertise, Dr. Williams was recruited in 2017 to become Chief Medical Officer (CMO) of Medical Support Los Angeles, a Medical Corporation, a/k/a MSLA.  Based on the issues described in this complaint and other concerns, Dr. Williams ultimately declined the offer for this position.

20.     In connection with Dr. Williams' recruitment for and his due diligence regarding the MSLA CMO position, Dr. Williams discovered the fraud and false claims which are the subject of this complaint.  The vast majority of the facts delineated below—and all of the material facts regarding the fraud at issue— have not been, are not now, and would not have been available to either the government or the public absent the knowledge acquired by Relator during his due diligence in connection with a job offer made to him by Defendant MSLA.

21.     During the course of Relator's due diligence, Relator independently discovered significant, valuable and detailed information serving as the basis for the claims set forth in this complaint, and Relator is the original source thereof.  After becoming aware of such information, Relator reported his concerns to his manager and supervisor (Dr. Mitch Heroman), per his company policy, but after receiving no response, he sought outside legal counsel which ultimately

resulted in Relator submitting a Confidential Disclosure Statement to the United States pursuant to 31 U.S.C. Section 3730.

22.     Relator, Dr. John M. Williams, Sr., M.D., M.P.H., provided his Confidential Disclosure Statement to the Attorney General of the United States and the United States Attorney for the Central District of California on October 23, 2019.  As required by 37 U.S.C. § 3730(e)(4), that Disclosure Statement and the documents attached thereto constituted written disclosure of substantially all material evidence and information possessed by Relator as of that date of its service.

23.     Said disclosure set forth detailed facts establishing causes of action against MSLA and MSLA Mgmt. for their having submitted false claims to the United States (Department of Veterans Affairs) in order to recover amounts to which these Defendants were not entitled for MDEs of veterans pursuing claims for disability benefits.  Relator now brings this action pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. § 3729 *et. seq*. ("FCA").

## IV.     Summary of False Claims

24.     Most veterans pursuing a claim for disability benefits will at some point undergo an MDE (sometimes referred to as a Compensation & Pension Examination or C&P Exam).   The Department of Veterans Affairs ("VA") uses either medical employees of the Veterans Health Administration or contracted medical professionals to perform MDEs.  The purpose of an MDE is for a properly-credentialled examiner to evaluate the veteran's claimed current disability, provide a diagnosis of the condition, provide an opinion about the etiology of the condition, and provide an opinion concerning the severity of the condition.

25.     An "MDE" is term of art, and it does ***not*** refer solely to an in-person exam by a doctor in the usual sense of a patient having a physical examination.  To conduct only an in-person

exam of a claimant is **not** sufficient to qualify as an MDE. There is much more involved than that. An in-person "examination" is only one component—and not necessarily the most important component—of an MDE.

26.     A medical examination, in the usual sense, is focused on *the present*. In contrast, an MDE is a forensic examination that is part of a specific legal process to determine not the just the existence and extent of a disability, but also whether a disability is "service-connected." A service-connected disability is an injury or disease that was incurred in or aggravated, beyond normal progression, during active military service. Furthermore, it is "essential, both in the examination [MDE] and in the evaluation of disability, that each disability be viewed in relation to its history." 38 CFR 4.1. Thus, *the past—i.e.*, a veteran's service records and medical records— play a singular role in the context of an MDE for which there is no parallel in the usual patient-doctor medical exam.

27.     From 2011 and until December 2017, MSLA contracted with the VA to do MDEs. Under the contracts, MSLA was to be paid by the VA for MDE reports completed according to the terms of the contract. The contracts provided significant financial incentives for MSLA to complete the reports very quickly ("timeliness") and with precision and thoroughness ("quality"). The contracts provided that MSLA would be paid additional amounts by the VA for exceeding the contract's "timeliness" requirements by completing examination reports faster than the contract's expectations and for exceeding the contract's so-called "quality" expectations.[1]

28.     The VA required MSLA to use as examiners only licensed graduates of accredited medical schools who possessed all necessary licenses, permits, accreditation, and certificates

---

[1] "Quality," as measured by the VA in this context, concerned, among other things, matters such as using the proper DBQ form, answering all required questions completely and clearly, and using the correct billing codes. This measurement did not evaluate the validity of reports. For example, "quality" did not consider whether a veteran's records had been reviewed appropriately or whether they had in fact been by someone who was properly credentialled.

required by the State Medical Board in the state where examinations were performed.  Additional requirements applied as to various types of examinations (for example, audiology, dental, eye, and mental examinations must be conducted by specialists in those fields).

29.    The veteran's medical records provided to the contractor by the VA (often this would necessarily be the entire case file or C-file) were required to be reviewed by the properly-credentialled examiner. On the completed reports, the properly-credentialled examiner was to indicate that he or she had reviewed the veteran's records for the claim in question.

30.    As part of the MDE, the properly-credentialled examiner was to order any additional testing of the veteran if such testing was determined *by the properly-credentialled examiner* to be necessary and to incorporate the results of any such testing in the properly-credentialled examiner's report.

31.    Reports documenting the MDE and submitted to the VA were to be completed and signed by the examiner who conducted the MDE and to indicate the examiner's credentials, for the obvious purpose of representing to the VA that the MDE—and not solely an in-person exam—had in fact been conducted by the properly-credentialled examiner.

32.    As detailed below, MSLA fraudulently induced the VA to award contracts to MSLA for MDEs. Then, after being awarded the contracts, MSLA did not provide MDEs as required by the VA.  Instead, MSLA not only delegated non-delegable examiner responsibilities to non-examiners who were not qualified, MSLA then fraudulently presented reports to the VA that made it appear all such work had been properly performed and/or at least knowingly approved by properly-credentialled examiners when such was not the case.

33.    MSLA allocated non-delegable components of the MDEs (such as deciding on medical tests, reviewing the service records and medical records, and finishing reports) to various

unlicensed and unqualified MSLA employees, and then misrepresented to the VA that such work had been performed by properly-credentialled medical examiners (whose digital signatures were affixed to the reports submitted to the VA by MSLA). As for these unlicensed and unqualified MSLA employees who performed such work, MSLA knew they were not licensed as required by the VA, knew they were not properly qualified as required by the VA, knew their credentials (or lack thereof) were not disclosed to the VA, knew they were not the medical examiners who were represented to the VA as being the ones who performed the MDE, and knew they were not the medical examiners whose digital signatures were inserted onto the reports submitted to the VA.

34.     MSLA knowingly submitted to the VA thousands of worthless MDE reports, and then submitted requests for payment to the VA for such reports that falsely represented the MDEs had been performed by a properly credentialled examiners as required by the VA. As a result, the VA unwittingly paid MSLA for worthless examination reports.

35.     Moreover, MSLA knowingly submitted false claims for millions of dollars in performance bonuses. MSLA was consistently paid incentive bonuses by the VA for allegedly completing exam reports faster than required/expected and for achieving higher than required/expected "quality" scores on the reports submitted. In reality, MSLA was able to submit reports to the VA so quickly only because MSLA improperly allocated functions that were required to be performed by properly-credentialled examiners to various MSLA employees MSLA knew were not properly-credentialled. MSLA then fraudulently misrepresented to the VA that the MDEs had been performed as required by properly-credentialled examiners.

**V.     The Federal False Claims Act**

10

36.      Fraudulently inducing the VA into contracts and/or submitting claims to the VA in order to fraudulently obtain payment for worthless, nonconforming goods constitutes a violation of the Federal False Claims Act ("FCA").  Section 3729(a)(1) of the FCA states in relevant part:

… any person who—

(A)      knowingly presents, or causes to be presented, a false or
 fraudulent claim for payment or approval; [or]

(B)      knowingly makes, uses, or causes to be made or used, a false
 record or statement material to a false or fraudulent claim; …

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 … plus 3 times the amount of damages which the Government sustains because of the act of that person.

37.      In addition, Section 3729(a)(1)(G), creates liability for:

Any person who … knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government ….

38.      When such violations are discovered by private citizens, the FCA allows those citizens to bring an action on behalf of the United States against the violators. 31 U.S.C. § 3730(b)(1).  The Relator brings this action pursuant to § 3730(b)(1).

### VI.      VA Disability Benefits and MDEs

39.      VA disability compensation is a tax-free monetary benefit paid to veterans with disabilities that are the result of a disease or injury incurred or aggravated during active military service. Compensation may also be paid for post-service disabilities that are considered related or secondary to disabilities occurring in service, and for disabilities presumed to be related to circumstances of military service, even though they may arise after service. Generally, the degrees

of disability specified are designed to compensate for considerable loss of function as well as work time from exacerbations or illnesses.

40.     Veterans initiate claims for disability benefits by filing an application with a VA Regional Office (VARO). Upon receipt of an application, VARO personnel collect relevant evidence needed to evaluate the claim. In order to be qualified to receive the disability benefit, a veteran must demonstrate that he or she presently suffers from a disability that was caused (or aggravated) by his/her active military service.  Because this benefit relies heavily on the medical condition of the veteran and injuries or diseases incurred during service, medical evidence is almost always necessary in order to prove both the nature of the present disability and the connection of that disability to service.

41.     The evidence that will be considered will often include the results of an MDE.  One of the VA's statutorily mandated duties to assist is the duty to help a veteran obtain medical evidence to prove his claim by providing a medical examination for the veteran. *See* 38 U.S.C. § 5103A(d); 38 C.F.R. § 3.159(c)(4).  The VA must provide a medical examination for a veteran whenever the veteran provides competent evidence of persistent or recurrent symptoms of a disability or a diagnosis of a disability, evidence of an in-service event, an indication that the symptoms or disability may be associated with the in-service event, or insufficient evidence for the VA to render a decision on the claim.  *See* 38 C.F.R. § 3.159(c)(4); *McLendon v. Nicholson*, 20 Vet. App. 79, 81 (2006).

42.      "VA has a duty to assist claimants in obtaining evidence to substantiate all substantially complete initial and supplemental claims."  38 C.F.R. § 3.159(c).  "In a claim for disability compensation, VA will provide a medical examination or obtain a medical opinion based upon a review of the evidence of record if VA determines it is necessary to decide the claim." 38

C.F.R. § 3.159(c)(4).  In this context, "**Competent medical evidence** means evidence provided by a person who is qualified through education, training, or experience to offer medical diagnoses, statements, or opinions."  38 C.F.R. § 3.159(a)(1).  It does not mean evidence provided by *anyone* else, and certainly not evidence provided by MSLA employees who wholly lacked in adequate education, licensing and experience (as is how things actually came to pass)

43.     The VA uses either medical employees of the Veterans Health Administration (the arm of the VA that runs the medical centers and clinics providing health care to veterans) or contracted medical professionals to do MDEs.[2]  The purpose of an MDE is to examine the veteran's claimed current disability, provide a diagnosis of the condition if possible, provide an opinion about the etiology of the condition, and provide an opinion concerning the severity of the condition.[3]

44.     MDEs "can be critical in supporting veterans' claims for benefits and represent a significant investment by the Veterans Benefits Administration (VBA)."[4]  As explained by the VA's Director of Compensation Services:

> An important part of accurately determining [the] healthcare and other benefits for which a veteran is eligible is through a [MDE]. For this reason **it is important that [MDEs] are performed under stringent clinical requirements and credentialing criteria for both the elements of the exam as well as the clinicians who perform them**.
> These requirements are the same whether the exam is conducted by a VA provider or a VA contracted community health provider.[5]

---

[2] *See, e.g.,* VA Office of Inspector Gen., 09-02135-107, Dep't of Veterans Affairs Audit of VA's Efforts to Provide Timely Compensation and Pension Medical Examinations 1 (2010).
[3] *See Nieves-Rodriguez v. Peake*, 22 Vet. App. 295, 300-01 (2008) (stating VA must provide adequate examination with a reasoned medical explanation for any determinations made); Dep't of Veterans Affairs, M21-1 Adjudication Procedures Manual, pt. III(iv), ch. 3, § D(2)(l) (2016).  (explaining that the VA's examinations require the use of a DBQ, which includes "a diagnosis section, medical history, objective findings, results of diagnostic testing performed, and a remarks section for any necessary explanation").
[4] VA, Office of Inspector General, Report 18-04266-115, *Inadequate Oversight of Contracted Disability Exam Cancellations* (Jun. 10, 2019).
[5] *VBA and VHA Interactions: Ordering and Conducting Medical Examinations: Hearing Before the H. Comm. on Veterans' Affairs*, 113th Cong. at 7 (2014) (statement of Thomas Murphy, Director, Compensation Service, Veterans Benefits Admin.).

45.     Qualified examiners performing an MDE use a "disability questionnaire" (DBQ) for most of the conditions they examine.[6]  DBQ's are condition-specific forms designed to capture medical information relevant to veterans' disability benefit claims. DBQs were created to provide standardized questions for each type of condition to ensure that examinations are thorough and complete, answering all questions necessary for the VA to determine whether or not a condition is connected to a veteran's service.

46.     Once completed, a report detailing the results of each MDE is provided to the VARO. Upon receipt of the report, in combination with other relevant evidence, VARO personnel make a rating decision on the veteran's disability compensation or pension claim.

47.     In summary, the process for obtaining an examination from a contractor can be summarized as follows:

(a)     Veteran files a claim requiring an MDE;

(b)     VBA claims processor inputs MDE request and routes the request to VHA or contractor depending on exam-type capacity;

(c)     For contractor exams, the contractor accepts the request, contacts the veteran to schedule a physical examination with a contract medical exam provider, and notifies veteran of appointment;

(d)     Contract medical exam provider conducts the MDE and provides documentation to the contractor; and

(e)     Contractor provides MDE documentation to the VBA.[7]

---

[6] See VA Office of Inspector Gen., 11-00733-95, Dep't of Veterans Affairs Audit of VA's Internal Controls over the Use of Disability Benefits Questionnaires 4 (2012) (explaining that disability benefit questionnaires were implemented by the VA to replace C&P examination report templates).

[7] This summary is derived from the summary set forth in VA, Office of Inspector General, Report 18-04266-115, Inadequate Oversight of Contracted Disability Exam Cancellations (Jun. 10, 2019).

14

48.     The VA provides the following summary for examiners regarding how to perform an MDE:

1.10     How do I perform a C&P examination [MDE]?

1.     Read the VSC request, including any remarks, specific questions, directions, or requested opinions.

2.     ***Review the claims file, service records, medical records, previous C&P examinations***, and BVA Remand if available. BVA Remand instructions generally require the examiner to review the claims file and the BVA Remand instructions and to so state in the final report.

3.     Explain the examination process to the veteran and confirm the claimed conditions.

4.     Examine the veteran following the appropriate worksheets for all claimed conditions.

5.     ***Order any required tests and procedures to establish diagnoses for rating purposes unless the diagnosis is already well established***.

6.     ***Prepare a complete typed report***, including claimed conditions, specific requests of the VSC or BVA, and whether or not the claims file was available and reviewed by the examiner.[8]

(emphasis added).

## VII.     Overview of Contract Requirements for VA contractors

49.     In 2011, the VA contracted with several vendors, including MSLA, to provide MDE services.[9]  In 2016, the scope of the program was expanded and such contracts were awarded to vendors, including MSLA, valued up to $6.8 billion over a five-year period.[10]

50.     After a bidding process, a successful bidder (such as MSLA) entered into a contract or contracts with the VA to provide disability medical examinations.  Under these contracts, the contractor was responsible for subcontracting with qualified medical professionals to serve as the examiners. ████████████████████████████████

---

[8] C&P Service Clinician's Guide (Lewis R. Coulson ed., 2002).
[9] *VBA and VHA Interactions: Ordering and Conducting Medical Examinations: Hearing Before the H. Comm. on Veterans' Affairs*, 113th Cong. 12-14 (2014) (statement of Thomas Murphy, Director, Compensation Service, Veterans Benefits Admin.).
[10] VA, Office of Inspector General, Report 18-04266-115, *Inadequate Oversight of Contracted Disability Exam Cancellations* (Jun. 10, 2019).

15

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████ The contractors submitted claims for payment for completed MDEs to the VA, and the contractor was responsible for reimbursing its subcontractors.

51.     In practice, the VA would notify a contractor (such as MSLA) that a particular veteran needed an MDE with regard to some particular claim or claims for benefits. The contractor was to then locate an appropriate examiner (*i.e.*, an examiner that was properly-credentialled for that MDE), schedule the in-person portion, and, only after ***the properly-credentialled examiner*** completed his or review, the examiner would a complete a report that the contractor would then submit to the VA.

52.     █████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████

53.     █████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████

16

54. 

55.

<sup>11</sup> Citations to the record refer to the CM/ECF system page number at the top of each page rather than page numbers at the bottom of each filing.

59.    This VA-mandated training DMA General Certification program further instructs examiners that "Prior to completing the documentation protocol(s) for the examination [*i.e* the final report], *you [i.e., the examiner] should order any tests required to confirm diagnoses and fully respond to the Request for Examination*. Additional tests may not be necessary in cases where a diagnosis is well-established and any such tests were already completed. Remember, the documentation will be used for rating purposes and not for treatment."

60.    Addressing the clear need for the examiner himself or herself to be the one to review the claimant's records/file, the VA explains that: "Prior test results *may* be used *if* they remain an accurate portrayal of the claimant's current medical condition and clinical status. *A review of the available medical records is important to avoid unnecessary testing.*"

61.    The VA-mandated training program also emphasizes to examiners that "*It remains the __responsibility__ of the medical provider to determine the appropriateness of testing* for a condition and safety if any clinical risk is involved."

62.    ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████

63.    ████████████████████████████████
████████████████████████████████████████



[redacted]

64. [redacted]

65. [redacted]



[redacted]

66. [redacted]

67. [redacted]

1

2

3

4

5

    68.

6

7

8

9

10

11

12

13

14

15

16

    69.

17

18

19

20

21

22

23

24

25

    70.

26

27

28





[redacted]

71. [redacted].

72. [redacted]

73. [redacted]



74.

75.     The VA similarly explained the purpose and nature of MDEs to claimants seeking benefits.  The VA explained to veterans and servicemembers that: "***The in-person part of your claim exam is only one part of what examiners do as part of their evaluation*. *They also typically spend more than an hour before or after appointments reviewing claims files to ensure they are providing the most complete and accurate reviews possible*."**  ECF No 25 at p. 186 (emphasis added).

76.     The VA makes it a point to explain that MDEs are "[u]nlike a typical medical exam" and should be thought of instead "as a medical review." *Id.*

77.     This "medical review" includes a review of records forwarded by the VA—a process that is part of "[t]he examiner's job": ***The examiner's job is to review your medical***

***records related to your disability claim, including the claim file, also known as your c-file/e-file.*** The C-file typically includes medical treatment records from Department of Defense (DoD), your DoD personnel records, treatment records from your health care providers and any other documents submitted." *Id.* at p. 185 (emphasis added).

78.     The VA further explains that ***the examiner*** needs to review the claimant's file to be able to even determine how to proceed with other parts of the MDE: "***Depending on the information in your claim file***, such as medical documents from current providers, and completed Disability Benefit Questionnaires (DBQs), ***the examiner*** will determine what additional questions and information are needed to confirm your health status and complete the exam." *Id.* at p. 186 (emphasis added).

79.     The VA also explains that determining whether a diagnostic test is necessary is a decision ***to be made by a <u>properly-credentialled</u> examiner***. *See, id.* at p. 186 ("[T]he ***examiner will determine*** what additional questions and information are needed to confirm your health status and complete the exam."); *see also, id.* at p. 185 ("Following your exam, the examiner completes a report that includes an analysis of clinical test results, if any were performed.").

80.     The VA further explain that qualified medical examiners are to complete MDE reports and such reports are to document that qualified medical examiner's own work. *See* ECF No. 25 at p. 185 ("Following [a veteran's] exam, the examiner completes a report that includes an analysis of clinical test results, if any were performed."); *id.* ("***[T]he examiner*** will complete a report that includes a review of the exam and any clinical test results."); *id.* at p. 147 (VA contractor, such as MSLA, "assigns a contracted examiner to conduct the exam and complete an exam report"); *id.* at p. 148 (figure depicting "Contractor Process for Completing Exams,"

including: "***Examiner*** conducts exam and sends completed exam report to contractor.") (emphasis added).

81.     The obvious purpose of the VA requiring that ***the examiner*** sign and set forth their credentials is because that individual is attesting to the contents of the report as being their work. *See id.* at p. 208 ("A private physician with an active medical license is qualified to sign and attest to completed DBQs" for MDEs and "[t]he physician ***must*** have sufficient medical expertise to conduct a medical assessment regarding the type of DBQ completed.").

82.     The VA has also explained that: "[I]t is important that C&P exams are performed under ***stringent*** clinical requirements and credentialing criteria for both the elements of the exam as well as the clinicians who perform them."  ECF no. 25 at p. 75.  The VA's ***strict*** qualifications for examiners would be meaningless if unidentified employees with unknown qualifications could edit and determine what records were made available for review by qualified examiners, could unilaterally determine what test to order or not order, and/or or could add and subtract at will from the final exam reports submitted to the VA.

83.     In short, the VA ***required*** not only that contactors (including MSLA) use properly-credentialled examiners, but obviously that those properly-credentialled examiners be the ones to do the actual work involved in conducting an MDE. That is, ***the properly-credentialled examiner*** himself or herself is to review the veteran's records and claim file, conduct an in-person exam, order and review the results of any tests, and then complete and sign a final report that documents *their* work.  If any or all of this necessary work was conducted by someone other than a properly-credentialled examiner, it would obviously be false to represent to the VA that such work had been conducted by a properly-credentialled examiner.  Moreover, it would be a false claim to submit

such reports to the VA and request payment for same when payment was only owed for MDEs conducted by properly-credentialled examiners as required by the VA.

84.     In response to a Congressman's question regarding what is done "to ensure that all of the exams, whether they are conducted at VHA or by a contractor, are being performed accurately," the VA spokesman answered by explaining the VA required submitted MDE reports to affirmatively indicate "the signature, license numbers, etcetera, that the doctors need to complete and provide an adequate DBQ[.]" ECF no. 25 at p. 104. Although the VA took care to audit the validity of license numbers provided by MSLA (*see, id*. p. 166-7), the VA had no way to know that MSLA was misrepresenting whether the physicians with those license numbers had actually been the ones to complete the work necessary to constitute an MDE (i.e., to review all records forwarded by the VA, determine what tests to order, incorporate results into reports, and have final say on the contents of the reports).

85.     The VA did not know, and never discovered, that, as will be described below, MSLA used its unqualified employees to do much of the critical, non-delegable work necessary to produce the reports that it submitted to the VA.  When MSLA submitted such reports to the VA, the reports falsely made it appear to the VA that licensed physicians, whose digital signatures and credentials were placed on the reports, had conducted MDEs as required by the VA.

### VIII.   MSLA violated the False Claims Act

**A.     MSLA is controlled by MSLA Management, LLC.**

86.     Per a Succession Agreement between MSLA and MSLA Mgmt., since March of 2016, MSLA Mgmt. has been "the sole and exclusive manager of the business, operations, and all non-medical activities of [MSLA], with full responsibility and authority to operate and manage the day-to-day aspects of such activities of the [MSLA]."  For the time period from March 2016

1    to the present, references herein to "MSLA" are to both Medical Support Los Angeles, a Medical

2    Corporation, and MSLA Management, LLC.

3    **B.    MSLA's incredible—and, it turns out, not credible—speed and "quality."**

4          87.    MSLA managed to submit MDE reports extremely quickly and with extremely high

5    "quality" scores, and as a result, MSLA was paid handsomely over the years.  Per a MSLA FAQ

6    document, "MSLA [was] rated number 1 with the VA 5 years in a row for quality assurance and

7    timeliness with submitting reports."   MSLA collected millions from the VA for examination

8    reports as well as for incentive bonuses.  Relator had access to information regarding how much

9    money may have been wrongfully collected by MSLA which was available on the VA's Strategic

10   Acquisition Center public website at https://www.va.gov/opal/sac/index.asp.

11         88.    In 2014, the VA reported to Congress regarding the average time to complete MDE

12   requests.[12] Per the report, most contractors were not able to complete reports within 26 days.

13   Veterans Evaluation Services (VES) was averaging 28 days, Logistics Health Incorporated (LHI)

14   26 days, Quality Timeliness Customer Service (QTC) 30 days, and Comprehensive Health

15   Services (CHS) 29 days. Yet, MSLA was somehow averaging an incredible 17 days.

16         89.    Sometimes "incredible" means just that: not credible. This is such a case.  MSLA

17   was able to submit so many reports so very quickly because the reports were not being prepared

18   according to VA requirements.  Indeed, although undoubtedly fast, the process used by MSLA

19   was nothing remotely like the process mandated by the VA.  To speed things up, MSLA repeatedly

20   removed the involvement of the properly-credentialled examiner—the most important person

21   (other than the veteran) to the examination process.

---

[12] *VBA and VHA Interactions: Ordering and Conducting Medical Examinations: Hearing Before the H. Comm. on Veterans' Affairs*, 113th Cong. at 63-64 (2014) (VA Responses to Pre-Hearing Inquiries).

90.     MSLA intentionally and systemically submitted and sought payment for MDE reports which misrepresented that the examiner whose digital signature was affixed to the report had reviewed the veteran's file and medical records; misrepresented that the examiner whose digital signature was affixed to the report had properly determined tests listed on the report were necessary; misrepresented that the examiner whose digital signature affixed to the report had ordered the tests conducted in connection with the MDE, misrepresented that the examiner whose digital signature was affixed to the report had reviewed, considered  and incorporated all tests results mentioned in the report; and misrepresented the examiner whose digital signature was affixed to the report knowingly approved and "signed" the final version of the report submitted to the VA.  Instead, much of this nondelegable work had been done by MSLA employees who lacked the necessary credentials (including unlicensed international medical graduates); whose involvement and credentials were not disclosed to the VA; and who were primarily motivated by MSLA's desire to move claims along quickly enough to earn bonus incentive payments for MSLA from the VA.

**C.     Synopsis of MSLA's scheme to defraud the VA.**

91.     MSLA's process for completing MDEs resulted in fraudulent reports being submitted to the VA in at least three ways:

a.     Prior to the physical examination component of the MDE, portions of the veterans' records that had been provided by the VA as being necessary for that MDE (the VA would have often provided the entire C-file as being necessary for an MDE) were cherry-picked by people lacking the required credentials and not by the examiner whose electronic signature would be affixed by MSLA to the final report. Because the properly-credentialled examiner was only provided those portions of the records which the staff of MSLA

deemed, for whatever reason, to be (what they self-servingly referred to as) "pertinent," the properly-credentialled examiner was not provided all of the veteran's medical records that had been deemed by the VA as being relevant for review by the properly-credentialled examiner.   As a result of MSLA's process, the properly-credentialled examiner was accordingly not in a position to be aware of or consider the other records in the veteran's file that had been provided by the VA to MSLA. ***In the MDE reports submitted to the VA, MSLA falsely represented that the veterans' claim files and medical records had been reviewed by the properly-credentialled examiners whose digital signatures and credentials were included on the reports.***

b.      Diagnostic tests for veterans were determined and ordered by people lacking the required credentials and not the examiner whose electronic signature would be affixed by MSLA to the final report. MSLA employees ordered diagnostic tests for the veteran soon after receiving the case from the VA, before the veteran ever saw the properly-credentialled examiner, and often before and without regard to a proper review of the veteran's existing records to see if a test was necessary or if it had been performed before. Oftentimes, such tests would have already been performed by third-party labs and diagnostic facilities prior to the examiner seeing the veteran. And, sometimes the results of these tests would be reported to MSLA after the examiner had completed his or her examination and report, and thus were never reviewed or seen by the examiner. ***In the MDE reports submitted to the VA, MSLA falsely represented that diagnostic tests for the veteran had been ordered, performed, and reviewed by the examiner whose signature and credentials were provided to VA.***

c.      The MDE reports prepared by examiners were not "locked" after the examiners submitted the work on the reports to MSLA and thus could be changed by MSLA staff. Indeed, after the examiners submitted the work on the reports to MSLA, MDE reports were changed by people lacking the required credentials, rather than the examiner whose electronic signature would be affixed to the final report. For example, as discussed in more detail below, MSLA's own Program Manager during the relevant period has alleged in a federal court pleading subject to Fed. R. Civ. P. 11(b) that test results were sometimes added to reports by MSLA staff after the examiner had submitted the report to MSLA and had concluded his or her work on the case. People other than the individual identified as the examiner on the report made changes to the reports without the approval or knowledge of the individual identified as the examiner. ***MSLA falsely represented that MDE reports were the product of the examiner whose signature and credentials were provided to the VA. In reality, reports were finished by MSLA employees who lacked the required credentials and without the properly-credentialled examiner's input or knowledge.***

92.     The three interrelated issues described above each undoubtedly played a crucial role in allowing MSLA to move veterans' files down the MSLA assembly line fast enough not only to meet (and often exceed) the VA's timeliness expectations, but frequently qualify for incentive bonuses as well.  In addition, these things also resulted in false claims because the MDEs were not at all that the VA required and had agreed to pay for (not to mention, far less than what the veterans were entitled to receive).

93.     In short, the VA contracted to receive and pay for MDEs by examiners who were licensed graduates of an accredited medical school, possessing all licenses, permits, accreditation, and certificates required by the State Medical Board in the state where examinations were

31

performed.  Examiners with such credentials were to be the ones to review the veterans' files and records, to conduct the examinations, to order additional tests if necessary and review the results of any such tests, and to prepare and sign reports documenting their findings.  Instead, MSLA fraudulently provided MDEs hastily built by committee—an unqualified, unlicensed committee that was more interested in bonus payments than in facilitating proper examination reports prepared in full by properly-credentialled examiners.

**D.** **Evidence of MSLA's false claims.**

94.     Generally speaking, there are currently at least four types of evidence showing that MSLA submitted false claims.  First, there are matters that Dr. Williams obtained or observed directly in his dealings with MSLA, while he was being recruited by OptumServe, the parent of MSLA, to become CMO of MSLA.  Second, there are matters Dr. Williams obtained from his meetings with Logistics Health Incorporated (LHI), another subsidiary of OptumServe, which, in turn, were based on both LHI's own due diligence review of MSLA (when LHI and its parent Optum were acquiring MSLA in 2016) and LHI's ongoing relationship with MSLA since that acquisition.  Third, there are matters raised in a federal lawsuit by MSLA's own Program Director Jeffrey Scarpiello.  Fourth, there are public materials (some described above) which support and elucidate Relator's claims, such as VA contract requirements and VA statements to Congress.

*1.* *Dr. Williams conducts due diligence regarding MSLA.*

    *a.* **Dr. Williams is invited to apply to be CMO at MSLA.**

95.     In the fall of 2017, Relator/Dr. Williams was working as the Senior Medical Director for UnitedHealthcare Military & Veterans (UHC M&V), a subsidiary of UnitedHealth Group (UHG), which is the parent of OptumServe.  His Manager and Supervisor, Dr. Mitch Heroman, the Chief Medical Officer (CMO) of UnitedHealthcare Military &Veterans (UHC

M&V), had been selected to move to a new entity within UHG, OptumServe, to assume the role of CMO as of January 1, 2018.  OptumServe's stated purpose was to provide high-quality and reliable health services to the military, Veterans and the Federal Government through its subsidiary companies at the time: MSLA, LHI, Quality Software Services, Inc. (QSSI) and the Lewin Group.  Meanwhile, Dr. Heroman was "dual-hatted" as CMO of both UHC M&V and OptumServe for the period of time from July to December 2017.

96.     Dr. Williams' position with UHC M&V was to wind up as of March 31, 2018.  Dr. Williams let Dr. Heroman know he would be interested in working with him at OptumServe if an opportunity became available, as Dr. Williams felt the two had an excellent working relationship at UHC M&V.  Further, Dr. Williams wanted to continue to work with the military and veteran population as he had the previous 5 years as a UHG employee, and from 1989-2011 as a commissioned medical officer in the US Navy, retiring at the rank of Captain.  *Id.* Dr. Williams is passionate about healthcare issues of veterans and military members and felt his experience would be a good fit if he could continue to work in this area.

97.     In early October 2017, Dr. Heroman contacted Dr. Williams about a possible job opportunity with MSLA as Chief Medical Officer.  MSLA had recently won a VA contract to service 3 additional regions, and they needed to quickly "scale up" their provider network to service the veterans living in these areas.  Dr. Williams was quite familiar with C&P exams, as he had done these as a Medical Director while employed by the VA from 2009-2010.

a.     **Dr. Williams conducts phone interviews with MSLA.**

98.     Dr. Williams expressed interest in learning more about the job, and a series of phone interviews were set up for October 9, 2017 with Carol Digan (VP and Human Capital Partner, OptumServe), Barbara Agen-Ryan (Chief of Staff, OptumServe), Patty Horoho (CEO,

OptumServe) and Matt Peterson (COO, OptumServe).  The phone interviews were fairly brief, and Dr. Williams was left with the impression that the job was his if he wanted it.  After the interviews, Dr. Williams let Ms. Digan know that he was still interested in the position but that he needed time, both because he wanted to conduct due diligence and because he was going on vacation for about 2 weeks.

99.    Dr. Williams' last phone interview that day had been with Matt Peterson (COO OptumServe), who was a former regional CEO at UHC M&V, and fellow veteran, with whom Dr. Williams had previously worked and had a close relationship with.  *Id*. Mr. Peterson was now working for OptumServe as COO.  *Id*.  He had been detailed as an interim CEO at MSLA. Mr. Peterson told Dr. Williams that Optum had acquired MSLA in 2016 and that MSLA was making an incredible amount of money.  *Id*. Mr. Peterson stated that MSLA was operating at a 25-30% profit margin. *Id*. Dr. Williams expressed his disbelief at such numbers, but Mr. Peterson insisted they were true. *Id.*

**c.    MSLA shares its process with Dr. Williams.**

100.    On October 18, 2017, OptumServe's Matt Peterson forwarded to Dr. Williams (and Dr. Heroman) an email with two attachments—a MSLA PowerPoint presentation ("MSLA Overview") and other material (including a Visio flow chart) regarding MSLA processes for examination reports under its VA contract.  This MSLA PowerPoint, flow chart and other material were proprietary internal company documents and were not publicly available.  Rather, this MSLA PowerPoint, flow chart and other material was only shared with Dr. Williams by OptumServe's Matt Peterson as Dr. Williams was being recruited by OptumServe, the parent of MSLA, to become CMO of MSLA.

101.    The MSLA PowerPoint outlined VA contract expectations and MSLA's own extreme expectations (see below page from the PowerPoint):

**MDE VBA Quality Expectations**

*VA Performance Requirement Summary (PRS)*

| Areas | Unsatisfactory Performance Standard | Expected Standard of Performance | Exceptional Performance Standard | MSLA's Performance Standards |
|---|---|---|---|---|
| Timeliness | Greater than 20 calendar days (or 30 calendar days for BDD, IDES, OCONUS or for Incarcerated Veterans) | Greater than 20 calendar days (or 30 calendar days for BDD, IDES, OCONUS or for Incarcerated Veterans) | Less than 20 calendar days (or 30 calendar days for BDD, IDES, OCONUS or for Incarcerated Veterans) | Maintain current performance of 18 average processing days. |
| Quality Review | 90% or less | 92% | 94% or greater | 98% or greater, maintaining 2% or lower error rate. |

102.    One diagram (appearing below), which explains MSLA's "Examination Request Work Flow," plainly shows that the MSLA "Diagnostic Team" rather than examiners (called "Providers" on the diagram) scheduled the diagnostic tests for veterans (and did so before examiners examined the veterans):



103.    Another diagram named MSLA's "Referral Life Cycle" (appearing below) depicts relative timelines for various phases of MSLA's process:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16
17
18
19
20
21
22
23
24
25
26
27
28

104.    The "Referral Life Cycle" illustrates that "DX [diagnostic test] Scheduling" is to

occur **before** the veteran sees the examiner.  Similarly, "Medical Records" are to be reviewed and

culled before the veteran sees the examiner.  And, "Ancillary Report Extraction," *i.e.,* gathering

results from diagnostic tests, is to occur during the same window as the examination itself—with

no time set aside for the examiner to review and incorporate any such ancillary report in his or her

findings and opinion.  Finally, the diagram illustrates that far more days are set aside for the

MSLA's "Quality Assurance" team to deal with the report after the examiner has submitted it than

are set aside for the examiner (himself or herself) to actually conduct an examination and prepare

the report in the first place.

37

105.    MSLA's "High Level End to End Process for VBA C&P Referrals" (appearing below) shows the examiner's examination and diagnostic tests on separate paths:



106.    Specifically, as the examiner is being hurried to submit the examination report in 48 hours ("Provider has 48 hours"), MSLA is independently extracting "DX results" which are from the "DX Facility" on a different schedule and by different people.

**d.    Dr. Heroman summarizes his vist to MSLA.**

107.    Meanwhile, Dr. Heroman had met in person with MSLA's CMO Dr. Sahniah Siciarz-Lambert, known to many as "Dr. Sonny," and other MSLA staff on October 18, 2017 during a site visit to their Pasadena, CA office.  According to an email dated October 18, 2017 from Dr. Heroman to Dr. Williams and others, Dr. Sonny and her team at MSLA walked Dr. Heroman through the MSLA processes and workflow in detail.  Based on his visit and walk

through, Dr. Heroman found the PowerPoint's "documentation of the flow to be nicely done," *i.e.*, accurate.

108.    On October 19, 2017, Dr. Heroman emailed several people at OptumServe to summarize the meeting he had the day before with "Dr. Sonny and her team" at MSLA.   Dr. Heroman described MSLA's process for VA examinations as follows (emphasis added):

> **"They [MSLA] prep the records** for the condition to be evaluated pulling those that [MSLA staff determines] the provider will need for the [DBQ], make the patient appointment, **and project [*i.e.* schedule/order] what labs will he needed** based on the DBQ requirements. **This '"Pre Qual" activity contributes to the excellent turn-around time they have achieved**. **They also review every DBQ [that has been completed and submitted to MSLA by the examiner after the examination] for quality in the "Qual" phase to make sure it is ready for submission [to the VA].  This has contributed to their 98% quality scores.** Finally they have a Post Qual that handles all addendums the VA sends back that they [MSLA] correct and use for feedback and improving their people and systems."

109.    Dr. Heroman added (emphasis added):

> "Although there are **several FMGs[13] without a license Dr. Sonny has hired**, they are not functioning as physicians but rather using their knowledge **to do the pre-qual, qual, and post qual areas of work**. As far as I could tell, no one is doing any work that would require a medical license."

110.    Of course, whether MSLA's unlicensed and inexperienced international medical graduates (as known as foreign medical graduates or FMGs) were doing "work that would require a medical license" outside the context of the VA contracts is not the only question.  There is also the question of whether MSLA was using these unlicensed and inexperienced international medical graduates to do work that, for purposes of the VA contract MDEs, was required to be done by properly-credentialled examiners, and then misrepresenting to the VA that such work had been performed by properly-credentialled examiners.  As to this question, Dr. Heroman's description

---

[13] Foreign Medical Graduates.

of MSLA's practices further supports that the answer was yes - MSLA was using the unlicensed international medical graduates in such a manner (*i.e.,* to order tests before examiners saw veterans and to edit reports after examiners had finished and submitted reports).

### e. Dr. Williams visits LHI and LHI shares what it has learned about the process at MSLA.

111.   On October 31, 2017, Dr. Williams and Dr. Heroman made a site visit to LHI in La Crosse, WI.  The purpose of this visit was to observe and review the "best practices" of LHI with regard to their contract with the VA to do C&P exams using their network of contracted providers.  Like MSLA, LHI was one of the 5 business entities awarded VA contracts in 2016 to do disability exams through a $6.8 billion enterprise-wide Medical Disability Examination Program.[14]

112.   During that visit, Drs. Williams and Heroman met with LHI's CMO, Dr. Bill Buchta, as well as their Medical Director for Veterans' Programs, Dr. Kate Kostamo, and the Director of Veterans' Programs, Steve Paquette.  Dr. Williams was also introduced to Don Weber (the founder of LHI who briefly expressed his concerns about MSLA to Drs. Williams and Heroman), and Dr. Williams and Dr. Heroman also met with Anne Finch (the LHI CIO who would later become LHI CEO).  The purpose of this visit was to see the "end to end" process used by LHI to do VA MDEs.  In theory, this information would help Dr. Williams and Dr. Heroman oversee in the future MDEs being done at MSLA.

113.   During the course of discussions while visiting LHI, the following was disclosed to Dr. Williams:

---

[14] *See also,* VA, News Release, *VA Awards $6.8 Billion for Medical Disability Examinations*, https://www.va.gov/opa/pressrel/pressrelease.cfm?id=2821

40

(i)    <u>LHI was familiar with the MSLA process.</u>  Dr. Kostamo and Mr. Paquette were part of an LHI team that assisted with Optum's due diligence during the MSLA acquisition process almost 2 years earlier.  LHI was clearly familiar with MSLA's policies and procedures for MDEs. Indeed, throughout Dr. Williams' visit, LHI personnel discussed with him how things were done by MSLA (and compared such methods to LHI's process).

(ii)    <u>The VA contracts reward speed and "quality".</u>  Dr. Kostamo noted that the VA MDE contracts allowed for significant performance bonuses/incentives for timeliness and quality metrics that exceeded the contract requirements.[15]  In other words, if the contractor's examination reports were completed and submitted faster to the VA than required, or were of a higher quality than required by the VA contract, bonuses/incentives were paid to the contractor by the VA.

(iii)    <u>MSLA edited examiner reports to improve "quality" scores.</u>  Dr. Kostamo expressed a concern that MSLA changed the examiner's examination report (without engaging the examiner) after the examiner had submitted a "completed report" to MSLA.  In this regard, Dr. Kostamo remarked that MSLA's 98% quality score was quite high. Indeed, MSLA's score was not only essentially perfect, but was well above the 92% contract requirement. Although revising reports after the fact could certainly allow for improvement of the "quality" scores as defined by the VA (and thus help MSLA receive performance bonuses/incentives from the VA), Dr. Kostamo said that amending or adding things to an examiner's report was not an allowable practice, because no one should change or alter the findings of the original examiner except for that examiner.  Dr.

---

[15]  VACO Compensation Service staff measured "quality" through sampling. VACO Compensation Service staff had no means of assessing whether tests had been ordered, and test results reviewed, by the properly-credentialled examiner identified on a report because MSLA's reports misleadingly made it appear that all tests had been ordered, and all test results reviewed, by the properly-credentialled examiner identified on the report. Additionally, the audits by VACO Compensation Service staff was limited to a review of the face of the reports themselves. Thus, VACO Compensation Service staff did not review underlying claims files or medical records to determine if tests had been properly ordered or not ordered under the circumstances.

41

Kostamo explained that LHI's practice was to "lock" examination reports after they were completed by the examiner, so that only the examiner could make any additions or changes after that point.   Dr. Williams was left with the clear impression that Dr. Kostamo, who was part of the LHI team that assisted with Optum's due diligence during the MSLA acquisition process (approximately 2 years earlier), understood that MSLA was not "locking" their reports but instead the reports were being edited to increase the "quality" of these reports after the fact by MSLA and without engaging/involving the examiner.   In short, the takeaway for Dr. Williams from Dr. Kostamo was: if Dr. Williams was going to work at MSLA, he should have MSLA start locking reports after the examiner was finished with the report.

        (iv)    MSLA improved its speed by ordering diagnostics tests prior to the examiner seeing the veteran and without engaging the examiner.   Dr. Kostamo also informed Dr. Williams that she was concerned that diagnostic tests were being ordered by MSLA staff in advance of the examiner seeing the veteran. This would also not be allowed, as only the examiner could place an order for a test after seeing the veteran.   Examples of such tests would include x-rays, sleep studies, audiograms, blood tests and pulmonary function tests, among others.   Ordering tests without bothering to wait for the veteran to see the examiner would obviously speed up the process.   MSLA was completing requests for reports considerably faster than other contractors and qualifying for bonuses/incentives.  Systematically ordering tests in advance of the examiner even conducting an examination would help explain how MSLA was doing so well on the "timelines" metric of the VA contract. Dr. Williams was left with the clear impression that Dr. Kostamo, who was part of the LHI team that assisted with Optum's due diligence during the acquisition process for MSLA (approximately 2 years earlier), understood that tests were in fact being ordered by MSLA staff in advance of the examiner seeing the veteran.   The takeaway for Dr. Williams from Dr. Kostamo

was: if Dr. Williams was going to work at MSLA, he should have MSLA stop the practice of MSLA staff ordering tests in advance of the examiner seeing the veteran.

(v)     MSLA averaged about $300 more than LHI per examination.   Dr. Kostamo also stated to Dr. Williams that MSLA examinations for the VA cost $300 more per examination, on average, than an LHI examination for the VA.  No particular explanation for this discrepancy was provided.  Ordering lab tests before a veteran sees an examiner could obviously result in unnecessary tests and additional costs.

**f.     Dr. Williams visits MSLA, further reviews its process, and observes improper test orders and misuse of doctor signatures.**

114.     During November 8-10th, 2017, Dr. Williams and Dr. Mitch Heroman made site visits to MSLA offices in Cypress and Pasadena, California.  During the visits, they met with MSLA's new CEO (as of November 7, 2017) Tony Lonigro, MSLA's long-time CMO Dr. "Sonny" (Dr. Sahniah Siciarz-Lambert), Sharon Almany (COO MSLA), Jeffrey Scarpiello (Program Manager MSLA), Alaina White (VP Networks MSLA), Nate Elam (Program Mgt staff MSLA) and Patty Jenkins (Nurse practitioner—Clinical Services MSLA).  Dr. Williams also met with Dr. Mastoora Khwajazada, an unlicensed MD whose MSLA title was "Manager of Clinical Quality."  Although Dr. Sonny's daughter, Dr. Lorinda Siciarz (also an unlicensed MD) was not present during the visit, Dr. Williams understood that her title was "Manager for Clinical Administration."

115.     During a meeting on November 10, 2017, in Sharon Almany's office at the MSLA Pasadena office (also attended by Dr. Heroman and Tony Lonigro), Dr. Williams directly observed MSLA's computerized Case Management System ("CMS") used to "schedule" (as MSLA called it) tests in advance of a veteran's physical examination. Dr. Williams also directly witnessed the

43

affixation of the expected/scheduled examiner's digital signature placed in the record, thus making it appear as if that examiner (who had yet to see the veteran) had ordered the test. At the time, MSLA personnel told Dr. Williams that tests were routinely "scheduled" (again, to use MSLA's preferred phrase) in advance of the examiner having *any* involvement, *and* it was MSLA's practice to, in essence, force that the examiner to "opt out" if they did not want a "scheduled" test to be performed.

116. At that time, Dr. Sonny also conceded (to Dr. Williams) that examiners would only rarely "opt out" of any tests "scheduled" (again, as she put it) by MSLA. She also conceded examiners did not even necessarily look at the lists of the tests that MSLA "scheduled." This being so, in those cases, they wouldn't even know which tests, if any, they would be basing their medical opinions on. Moreover, this was presented to Dr. Williams as being MSLA's standard operating procedure, and, given Dr. Sonny's comments, this necessarily meant *contracted examiners were either ignorant of the practice or followed it without question, and perhaps even assumed, incorrectly, it was the VA's practice or policy* (when, in fact, the VA demanded the exact opposite, that being examiners were the ones who had to make all decisions having to do with tests to be conducted.

117. Upon witnessing these things, Dr. Williams protested and pointed out that the tests were, in fact, being ordered - - not merely "scheduled", by unlicensed MSLA surrogates, who then affixed the physician's electronic signature without his or her knowledge. In protesting, Dr. Williams further noted the impropriety (if not illegality) of this practice, among others things because the examining medical doctor physician was unaware of the order, *and* the fact that his signature was being used in such a manner.

118.     Dr. Williams therefore determined that MSLA was improperly and illegally using contracted examiners' personal digitized electronic signatures to order diagnostic testing before the in-person exam took place, and without the examiners' knowledge.  In these regards, it's important to bear in mind that ordering exams shortly after receiving an MDE request from the VA (and well before the veteran sees an examiner) would, of course, decrease the turnaround time for MSLA to complete and submit a report, and result in MSLA earning timeliness bonuses.

119.     Given Dr. Sonny admitted that MSLA contract examiners did not even look at the lists of tests ordered by MSLA, examiners were never even involved in determining whether tests (necessary or otherwise) were ordered.  Even worse,  MSLA not sharing the full file with qualified examiners meant they (the qualified examiners) were never able to even determine what records might or might not indicate a need for tests.

120.     During his visit to MSLA, Dr. Williams also inquired as to the process that MSLA employed for credentialing its contracted examiners.  He was informed that an unlicensed international medical graduate, Dr. Mastoora Khwajazada, chaired the MSLA Credentialing Committee, as Dr. Sonny "had no interest" in working with the credentialing process.  Further, Dr. Williams was told that MSLA had not been audited by the VA with respect to their credentialing process, but that it "may occur sometime in the future."  It was not entirely clear as to what parameters they were using to credential their examiners, and they appeared to make assumptions about whether an examiner actually had malpractice insurance.  Also, MSLA said they did not use the American Medical Association (AMA) service (https://amacredentialingservices.org/credentialing/physician-profiles) to do primary source credential verification because it "cost too much" at $45.00/request, so they (MSLA) would go directly online to attempt to obtain similar information from an open-access state medical board

website.  As a former Co-chair of the UnitedHealthcare National Credentialing Committee, Dr. Williams found the MSLA credentialing process to be inadequate.

**g.    Dr. Williams declines the offer to work with MSLA.**

121.    After the site visit to MSLA, Dr. Williams discussed with Tony Lonigro and Carol Digan what he thought regarding the CMO position at MSLA.  Because of Dr. Williams' discoveries about MSLA's processes and procedures, along with other issues, Dr. Williams declined the offer of employment as CMO of MSLA.

122.    In an email to Tony Lonigro (CEO, MSLA), Dr. Mitch Heroman (Dr. Williams' Manager and Supervisor) and Carol Digan (VP and Human Capital Partner, OptumServe) on November 21, 2017, Dr. Williams declined the offer to serve as CMO for MSLA. Dr. Williams sent an email to Dr. Heroman on November 22, 2017 summarizing in writing the concerns he had about MSLA's business processes that came up during the site visit and that the two had discussed verbally prior to that date, including an attachment entitled "Issues to investigate."  Dr. Williams never received a response to that email.

123.    With regard to the UnitedHealth Group False Claims Act Compliance Policy, Dr. Williams discharged his responsibilities as an employee by reporting his concerns to his manager and supervisor (Dr. Mitch Heroman). After receiving no response, he sought outside legal counsel, which ultimately resulted in the information being voluntarily provided to the Government.

**h.    The VA stops working with MSLA.**

124.    With regard to its 2016 VA contract, MSLA was unable to subcontract with sufficient, qualified examiners to meet the demands of its expanded VA contracts and thus, in

46

December of 2017, the VA stopped using MSLA for MDEs.[16]  MSLA subsequently self-reported that it had overcharged the VA more than $2 million for examinations due to "accounting errors."

125.    MSLA most certainly never disclosed that it was paid for years by the VA for fraudulent MDE reports. And MSLA has certainly never disclosed that it knew the reports were inaccurate and misleading when they were submitted.  MSLA has also never attempted to repay any of the contract payments or incentive bonuses that they received only because of fraudulent MDE reports they submitted to the VA.

**2.    *MSLA's own Program Director says MSLA submitted fraudulent examination reports to the VA.***

126.    One of the MSLA officials that Dr. Williams met in 2017 was Jeffrey Scarpiello, MSLA's Program Manager.  Mr. Scarpiello started at MSLA in 2014.  He had previously worked for the VA.  In fact, while at the VA, Mr. Scarpiello helped draft, select and award disability examination contracts to vendors.  He also helped draft the VA policies, directives and guidance governing the C&P exam process. In 2014, when he was MSLA's Director of Business Development, MSLA sent him to represent MSLA before the House Committee on Veteran Affairs.[17]

127.    In 2018, Mr. Scarpiello filed a breach of contract lawsuit against MSLA; MSLA Management, LLC; Logistics Health, Inc.; Optum, Inc. d/b/a OptumServe; and UnitedHealth Group Incorporated.  Mr. Scarpiello was seeking to recover unpaid commissions.  He also alleged that he was retaliated against because of complaints he made internally at MSLA regarding

---

[16] VA, Office of Inspector General, Report 18-04266-115, *Inadequate Oversight of Contracted Disability Exam Cancellations* (Jun. 10, 2019).
[17] *VBA and VHA Interactions: Ordering and Conducting Medical Examinations: Hearing Before the H. Comm. on Veterans' Affairs*, 113th Cong. at 59 (2014) (statement of Jeff Scarpiello).

MSLA's "inappropriate and illegal behavior."  In particular, Mr. Scarpiello's complaint, filed subject to Fed. R. Civ. P. 11(b), provides that:

> Plaintiff [Mr. Scarpiello] also learned that, in an effort to meet the contract-imposed 20-day turnaround time, Defendants MSLA and/or MSLA Mgmt. were improperly processing veterans' diagnostic tests.
>
> The proper procedure called for veterans to be examined prior to having any diagnostic test conducted.
>
> Defendants MSLA and/or MSLA Mgmt. would schedule diagnostic testing, and when diagnostic tests were complete, **Defendants MSLA and/or MSLA Mgmt. would add the findings to the already complete/signed medical report without the examining provider's knowledge, thus making it seem as if the provider had reviewed the report**.

128.    As the Program Director at MSLA for several years, Mr. Scarpiello would have had direct knowledge regarding whether MSLA would "add [diagnostic test] findings to the already complete/signed medical report without the examining provider's knowledge, thus making it seem as if the provider had reviewed the report."  Mr. Scarpiello's assertions do not in any way rely on or refer to allegations herein by Relator.  Mr. Scarpiello's assertions, based on his personal insider knowledge of MSLA, are, however, entirely consistent with what Dr. Williams observed and determined in the course of his own investigation of MSLA.

129.    Mr. Scarpiello clearly has further knowledge that will directly corroborate the claims asserted by Relator.  Mr. Scarpiello was contacted on Relator's behalf to discuss the claims asserted by Relator but Mr. Scarpiello explained that resolution of his lawsuit against MSLA included a nondisclosure agreement.  Relator thus subpoenaed Mr. Scarpiello to give a deposition in this case but, in response, discovery was stayed at MSLA's request. *See* ECF Nos. 48 and 55.

**E.    MSLA misused examiners' digital signatures.**

130.    Central to many of Dr. Williams' concerns regarding MSLA's process was MSLA's use/abuse of examiners' digital signatures.  As noted above, Dr. Williams observed in

48

MSLA's computerized Case Management System tests "scheduled" in advance of a C&P examination and also that digital images of signatures of the expected/scheduled examiners were in the record, as if the examiners had signed the orders for the tests when the examiners had not done so.  Similarly, MSLA's Mr. Scarpiello has maintained that MSLA "would add the findings to the already complete/signed medical report without the examining provider's knowledge, thus making it seem as if the provider had reviewed the report." In other words, MSLA used examiners' digital signatures *before* the examiner's involvement with a veteran even began and also used them *after* the examiner believed his involvement was complete.

131.     When subcontracting with doctors to be examiners, MSLA represented in the "Base Subcontractor Agreement" with the doctors that MSLA needed "permission to use this [digital] signature for the sole purpose of submitting your reports to the Veterans Administration."  MSLA did not disclose to doctors that it would routinely use their digital signature to "schedule"/order diagnostic tests without their knowledge or involvement.  And, MSLA did not disclose to doctors that it would use their digital signatures on reports that had been revised by MSLA without the examiner's knowledge or involvement.

**F.     MSLA submitted false claims to VA.**

132.     MSLA intentionally submitted MDE reports to the VA with the digital signature of the examiner who had conducted the medical/physical examination affixed, without that examiner's permission or knowledge, by MSLA to make it appear—falsely—that that same examiner (a) had not only ordered but reviewed and considered the results of any tests mentioned in the report; (b) had reviewed the veterans' file and medical records sent along for that MDE by the VA and determined for himself or herself which records were relevant to the case; (c) had reviewed and considered all of the veteran's relevant medical records in reaching the conclusions

49

in the report; and (d) had reviewed and approved the final version of the report that was submitted to the VA.

133.    MSLA knew the reports were false and misleading.  MSLA also knew the VA was relying on the veracity of the reports submitted by MSLA, and knew the VA was relying on MSLA to use an examiner's signature only when an examiner had reviewed all relevant records of the veteran (with relevancy being determined by that examiner), ordered and reviewed the results of all relevant and necessary tests, and approved the final version of the report submitted.  Despite such knowledge, MSLA then submitted claims for payment (and was paid) for the fraudulent MDE reports. Moreover, MSLA was also paid incentive bonuses by the VA based on the fraudulent examination reports, which incentives were only achieved because fraudulent reports and processes were used.

134.    The following list sets forth the misrepresentations by MSLA in examination reports submitted to the VA (which formed the basis of MSLA's false claims for payment) in chronological order of how MSLA would go about generating and submitting an examination report to the VA.

*1.    MSLA misrepresented that diagnostics tests were ordered by the examiners who conducted the physical exams.*

135.    MDE reports submitted by MSLA necessarily included diagnostic test results and a digital signature of an examiner.  The reports submitted made it appear the examiner listed on the report had ordered such tests.  MSLA's reports did not disclose that tests were ordered by MSLA staff and before that examiner saw the veteran.  The reports made it appear any tests were ordered pursuant to VA protocol (*i.e.*, by an examiner actually examining a veteran).

50

136.    In reality, tests were ordered by unlicensed MSLA staff and not by properly-qualified licensed physicians who actually performed the examinations.  That this was the practice was discovered by Dr. Williams.  Additionally, the previously referenced internal MSLA PowerPoint forwarded to Dr. Williams confirmed this was the practice ("Diagnostic Team [not the examiner] Schedules any required testing" well before examiner sees veteran).

137.    Further, MSLA FAQs uncovered by Dr. Williams further confirms this ("If diagnostic testing is needed this will be authorized beforehand by our [MSLA] Case Coordinators" and "MSLA Coordinators will authorize DX testing if needed" and "MSLA is the ordering Physician, the doctor who performs the initial general medical C&P exam are providers who are contracted with MSLA as Independent contractors. You [the lab conducting a test] are not required to send them the requisition form.").  Again, Dr. Williams directly observed in MSLA's computerized Case Management System that there were tests "scheduled" in advance of the physical examinations and also that a digital image of the signature of the expected/scheduled examiners were in the records, falsely making it appear the examiner had himself or herself actually ordered the tests.  MSLA personnel told Dr. Williams that tests were routinely "scheduled" in advance.

138.    Dr. Williams also determined that MSLA was improperly using contracted examiners' personal digitized electronic signatures to order diagnostic testing before the in-person exam took place and without the examiners' knowledge.  Ordering exams shortly after receiving an MDE request from the VA and well before the veteran sees an examiner would, of course, decrease the turnaround time for MSLA to complete and submit a report.  However, in trying to cut corners, MSLA was ordering tests in examiners' names when the examiners had not ordered the tests and for veterans that the examiners had not yet seen.

51

139.    A test is not "medically advisable" for purposes of a VA MDE if the test was not determined to medically advisable and thus ordered by a properly-credentialled examiner. Given that Dr. Sonny admitted that MSLA contract examiners did not even look at the lists of tests ordered by MSLA, such examiners were never involved in determining whether unnecessary tests were ordered.  Moreover, because MSLA was not sharing the full file with examiners, examiners were not able to determine what information in the file that was never provided to them would indicate about the need for tests.

**2.    *MSLA misrepresented that the veterans' records provided by the VA were reviewed by the examiners whose signatures and credentials were affixed to submitted reports.***

140.    Dr. Williams discovered that unlicensed MSLA staff decided which portions of the records provided by the VA for a veteran's claim were forwarded to a properly-credentialled examiner.  Thus, the actual and properly-credentialled examiners would never know if additional records were among the records that had been provided by the VA that they (the qualified examiner) might have considered relevant to the veteran's claim, and which could have made a significant difference in the determination as to whether a veteran's illness or injury was service-connected and thereby eligible for compensation and medical care.  Likewise, the actual examiners would never know if additional records were in the records provided by the VA which might have changed their decision on the severity of the veteran's illness or injury and thus the benefits to which they were entitled. Since the properly-credentialled examiner was not provided all records provided to MSLA by the VA for the veteran's claims, the reports submitted by MSLA's reports submitted to the VA fraudulently represented that the properly-credentialled examiner had reviewed the veteran's records for such claims.

141.    Unbeknownst to the VA, MSLA described its process to its contract examiners in their FAQ document as follows:

> Q: Do we [examiners] get the Veterans history prior to seeing them? If so, how do we receive it?
>
> A: Yes, we [MSLA] have a Quality Assurance program and staff within the program that upload **pertinent records** that pertain to each claim condition you are evaluating. This is uploaded into our system before you see the patient.
>
> We have a Quality Assurance program with **staff that uploads pertinent records** that pertain to each specific claim conditions. This actually **cuts your record review in half** so instead of an hour long record review; you are looking at approx. 20-30 minutes long.

142.    Indeed, according to MSLA's FAQs, within a day or two of receiving an examination request from the VA, MSLA staff would "[p]ull **only** the records that apply to the DBQs for that case." MSLA promised examiners "[t]he record review can take approx. 20-30 minutes long since our Quality Assurance staff uploads **pertinent records** which cut your record review in half."

143.    On information and belief, MSLA did not disclose, and the VA was not aware of, this MSLA FAQ document.  Indeed, MSLA's bid documents to obtain the MDE contracts that were disclosed to the VA represented (falsely) that MSLA would fully comply with contract requirements, including requirements that all records provided by the VA for a given MDE were to be provided to the properly-credentialled examiner assigned to that MDE.  Moreover, as described above, the MDE reports submitted to the VA falsely represented the properly-credentialled examiner whose signature and credentials were affixed to the report had reviewed the records provided by the VA for that MDE.

144.    Given that the VA was going through the trouble of determining what records to send along to MSLA for a given MDE and VA's express requirement that records provided by the

53

VA be made by available to the properly-credentialled examiner, it is implausible to suggest the VA knew, yet did not care, that MSLA was editing the records sent by the VA and only providing select portions of such records to properly-credentialled examiners. Indeed, MSLA's clearly process was not allowed by the VA or the VA contracts and resulted in unacceptable and inadequate examination reports. MSLA's process resulted in examination reports that simply were ***NOT*** what the VA agreed to pay for.  As the Veterans of Foreign Wars (VFW) has put it during testimony before Congress:

> When contract providers fill out Disability Benefit Questionnaires (DBQs) for veterans, they must verify whether or not they have fully reviewed the veteran's file. They usually affirm that they have and then go on to render an opinion. However, **we have learned that the vendor selects which specific files to share with a provider ahead of the exam, meaning they likely never fully review the file**. We have also heard reports that some contract providers solely rely on the claimant's pre-exam worksheet to evaluate the historic record of a condition, rather than the official claim file documents. To the VFW, **both scenarios render the exam unacceptable and inadequate**.[18]

145.    MSLA routinely and systemically submitted reports wherein the appearance of physician's digital signature made it appear that that physician had himself or herself reviewed the veteran's file or records sent to MSLA by the VA for that MDE.  ***Nothing could be further from the truth***.  In reality, and as intended by MSLA, the properly-credentialled examiner could and did only review whatever select records the unqualified MSLA staff shared with the properly-credentialled examiner to review for that case.

146.    For purses of conducting an MDE,  a proper review of the C-file is every bit as important as the in-person exam. As MDEs are a forensic medical review, an examiner reviewing only a truncated or edited version of the C-file would not provide the examiner with sufficient information to broadly address all of the veterans' conditions, much less to assess them in a proper

---

[18] *Exploring VA's Oversight of Contract Disability Examinations: Hearing Before the H. Comm. on Veterans' Affairs*, (November 15, 2018) (statement of Michael Figlioli, Deputy Director, National Veterans Service).

historical context—especially when the file has been edited or truncated by non-licensed, non-physician personnel.  *See,*  38 CFR 4.1 ("It is thus **essential**, both **in the examination** [MDE] and in the evaluation of disability, that each disability be viewed **in relation to its history**.") (emphasis added).

147.  ███████████████████████████████████████

███████████████████████████  As detailed, a review of the full file forwarded by the VA is part of "the examination." Because this review of the veteran's records and file are an integral and nondelegable component of conducting an MDE, the person at MSLA who actually reviewed the full file sent by the VA was a person who "conducted the examination"—*i.e.*, conducted a non-delegable component of the "medical review" that constitutes an MDE— but yet did *not* sign the reports or list their credentials on the reports submitted to the VA.  Rather, the only person whose signature was affixed to MSLA reports was a person who did NOT conduct all of the integral and nondelegable components an MDE, including review of the veteran's file and records forwarded by the VA.  As a result, the person signing MSLA's reports may have conducted a portion of what was required (an in-person exam) but was not the only person who conducted "the examination," *i.e.*, the MDE or "medical review" that was requested by the VA.

**3.**    ***MSLA misrepresented that the final MDE reports submitted to the VA had been approved by the examiners who conducted the physical exams and whose signatures and credentials were affixed to the reports.***

148.    Moreover, MSLA changed reports without the knowledge or involvement of the individual whose digital signature and credentials were included on the final, submitted report. As noted, LHI personnel (who had reviewed MSLA's processes when MSLA was acquired in 2016), intimated to Dr. Williams that MSLA was achieving such high "quality" scores because

MSLA was editing/revising/amending examination reports after the examiner submitted his or her final "completed" report and that MSLA was doing so without engaging the examiners.  MSLA had at least two related incentives for not involving examiners with such work. ***First***, the work of going back to the examiners and asking for their assistance would take precious time and significantly undermine MSLA's efforts to be paid incentive bonuses. ***Second***, MSLA was having trouble subcontracting with sufficient numbers of examiners and was clearly going out of its way to make the work as attractive and easy as possible for the examiners. Of course, a desire for speed and a desire to appease examiners would never justify submitting reports to the VA, which falsely represented that the reports were the work product of the examiners.

149.    MSLA's own Program Manager, Mr. Scarpiello has asserted in his lawsuit against MSLA that he was retaliated against because of complaints he made internally at MSLA regarding MSLA's "inappropriate and illegal behavior."  In particular, Mr. Scarpiello asserted in his lawsuit that:

> 88. Plaintiff [Mr. Scarpiello] also learned that, in an effort to meet the contract-imposed 20-day turnaround time, Defendants MSLA and/or MSLA Mgmt. were improperly processing veterans' diagnostic tests.
>
> 89. The proper procedure called for veterans to be examined prior to having any diagnostic test conducted.
>
> 90. Defendants MSLA and/or MSLA Mgmt. would schedule diagnostic testing, and when diagnostic tests were complete, **Defendants MSLA and/or MSLA Mgmt. would add the findings to the already complete/signed medical report without the examining provider's knowledge, thus making it seem as if the provider had reviewed the report**.

150.    Mr. Scarpiello's direct knowledge that MSLA would "add [diagnostic test] findings to the already complete/signed medical report without the examining provider's knowledge, thus making it seem as if the provider had reviewed the report" is entirely consistent with Dr. Williams's investigation.  LHI intimated to Dr. Williams, that, having reviewed MSLA's process

56

in the course of LHI's corporate due diligence, MSLA was likely changing the examination reports without engaging the examiner after the examiner submitted a "completed report" to MSLA.  Mr. Scarpiello's findings are also consistent with what Dr. Williams discerned from reviewing MSLA's "work flow."  For example, MSLA's "Referral Life Cycle" provides that "Ancillary Report Extraction", *i.e.,* gathering results from diagnostic tests, is to occur during the very same time window as the examination itself—that is, no particular time is set aside for the examiner to review and incorporate any such ancillary report in his or her findings and opinion.  Mr. Scarpiello's assertion— that MSLA would "add [diagnostic test] findings to the already complete/signed medical report without the examining provider's knowledge"—explains how it would be possible for MSLA's "Ancillary Report Extraction" to be going on even as the examiner was submitting his or her "completed" report.

**G.     MSLA's misrepresentations were "material" to the VA.**

151.    VA requests to MSLA for MDEs required that a qualified examiner review the records sent for that request, that that qualified examiner order tests and review the test results, and that that qualified examiner set forth their findings and conclusions in a report that was fully approved by them as their report.   In other words, the entire purpose of the contracts was not for MSLA to merely complete and return worksheets, but rather to provide veterans with MDEs by qualified examiners.

152.   MSLA knew that the physicians whose signatures and credentials were listed included on the reports had not even been provided, and thus could not have reviewed, all records the VA had deemed relevant for a qualified examiner to review.  MSLA also knew its unqualified staff ordered tests without an examiner's involvement. MSLA further knew its staff added test results and made other changes to the reports without the examiner's knowledge. However, and despite all these things MSLA knew, it falsely represented that the licensed physician whose signature and credentials were provided to the VA had not only conducted the MDE as required but had approved the final report that was submitted to the VA.

153.   Anyone reviewing the reports submitted by MSLA would conclude— wrongly— that the examinations documented on those reports had been completed by the licensed physicians whose digital signatures and credentials appeared on the reports.  In other words, anyone reviewing MSLA's reports and requests for payment for such reports would conclude—wrongly—that MSLA had complied with the core contract requirement to provide MDEs/C&P Exams completed by properly-credentialled examiners.  There was a snowball effect when properly-credentialled

examiners were not sent the full file received by MSLA from the VA. That snowball effect excluded examiners from being able to make decisions incumbent upon them (alone) concerning whether a test would or would not be ordered. They were also excluded from incorporating new test results into the final report, as well as from reviewing the final report to be submitted to the VA.

154. First, qualified examiners not being provided all of the service and medical records sent to MSLA by the VA for review necessarily meant the examiner was *entirely* unable to conduct a full in-person exam--and, how could they? They didn't have all of the historical and background information deemed necessary by the VA for them to address the fundamental questions that gave rise to the need for an MDE in the first place.

155. Further, since qualified examiners were not provided all the records sent by the VA (to be forward by MSLA to the examiner), *they did not even know* what those other records might indicate with regard to the need for tests or other things. Thus, the qualified examiner was not able to develop a complete medical opinion following the in-person exam, or even the need for additional tests (much less their results). In other words, without full historical background information relative to the veteran claimant, the need for additional tests (and, in fact, the rendering of a complete or otherwise accurate medical opinion) was impossible. Moreover, a/the qualified examiner had no way of knowing if any needed tests had (although contrary to MSLA's obligations) been ordered by MSLA's unlicensed and unqualified personnel, much less the results of that new test. This, in turn, necessarily rendered the examiner entirely unable incorporate such tests and results into a final report.

156. ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████ As

157. ***The person who actually reviewed the full files and records sent by the VA was not the person who "conducted the examination".*** Instead, this non-delegable component of the "medical review" was conducted by someone other than a qualified examiner (who had to be a medical doctor), and that person did not, as required, sign the reports or list their credentials on the reports submitted MSLA to the VA. Instead, ***the person whose signature was affixed to MSLA was someone other than the medical doctor examiner – someone who did NOT conduct all of the integral and nondelegable components of the MDE*** (one of which was a review of the veteran's file and records forwarded to MSLA by the VA for a "medical review").

158. The end result of MSLA's scheme was that the examinations ("medical reviews") and resulting reports provided by MSLA were not MDEs for purposes of the VA's contracts with MSLA or for purposes of the VA's legal obligations to provide MDEs for the veterans and service members in question. For the VA's purposes, MSLA's reports were worthless, nonconforming goods.

159. In June of 2014, the U.S. House of Representatives Committee on Veterans' Affairs held hearings, entitled "VBA and VHA Interactions: Ordering and Conducting Medical Examinations," to examine the "VHA and VBA as to their respective efforts to conduct medical examinations on veterans' claims for disability benefits known as C&P exams" and "look for

sensible solutions and best practices to achieve both the most effective access to medical treatment as well as assurance of timely, high quality C&P exams for disability adjudication."[19]

160.   At the hearing, committee member Congresswoman Ann Kirkpatrick noted that:

While contracting out compensation and pension examinations gives VA primary care doctors more time to see patients, **we cannot sacrifice quality for efficiency**. We have received several reports of compensation and pension exams being performed by **contract doctors that do not have the licenses or credentials to perform these exams**—which can lead to wrongfully denied claims, and the growing backlog of appealed claims. [20]

161.   First to testify was Thomas Murphy, Director of Compensation Service for the Veteran Benefits Administration. Speaking directly to Congresswoman's Kirkpatrick's concerns, Mr. Murphy emphasized that the VA's use of contractors for MDEs did not and would not "sacrifice quality for efficiency."

162.   Mr. Murphy emphasized that MDEs "are performed under stringent clinical requirements and credentialing criteria" and "[t]hese requirements are the same whether the exam is conducted by a VA provider or a VA contracted community health provider":

The Department of Veterans Affairs is committed to providing timely, high quality healthcare and other benefits that veterans de-serve and have earned through their service. An important part of accurately determining those healthcare and other benefits for which a veteran is eligible is through a C&P examination. For this reason **it is important that [MDEs] are performed under stringent clinical requirements and credentialing criteria for both the elements of the exam as well as the clinicians who perform them. These requirements are the same whether the exam is conducted by a VA provider or a VA contracted community health provider**. [21]

---

[19] *VBA and VHA Interactions: Ordering and Conducting Medical Examinations: Hearing Before the H. Comm. on Veterans' Affairs*, 113th Cong. at 1, 4 (2014) (statement of Hon. Jeff Miller, Chairman, U.S. House of Representatives Committee on Veterans' Affairs); https://archives-veterans.house.gov/sites/republicans.veterans.house.gov/files/113-77.pdf

[20] *VBA and VHA Interactions: Ordering and Conducting Medical Examinations: Hearing Before the H. Comm. on Veterans' Affairs*, 113th Cong. at 7 (2014) (statement of Hon. Ann Kirkpatrick, U.S. House of Representatives Committee on Veterans' Affairs); https://archives-veterans.house.gov/sites/republicans.veterans.house.gov/files/113-77.pdf

[21] *VBA and VHA Interactions: Ordering and Conducting Medical Examinations: Hearing Before the H. Comm. on Veterans' Affairs*, 113th Cong. at 7 (2014) (statement of Thomas Murphy, Director, Compensation Service, Veterans Benefits Admin.); https://archives-veterans.house.gov/sites/republicans.veterans.house.gov/files/113-77.pdf

163.   Mr. Murphy then explained that the VA will not accept an MDE that is not "performed under [its] stringent clinical requirements and credentialing criteria."   Specifically, Mr. Murphy described a recent incident wherein there was doubt as to whether the exams of 51 veterans had been "performed under [its] stringent clinical requirements and credentialing criteria" and thus the VA ordered that all of those veterans be provided new C&P exams:

> A case has been identified where 51 veterans were previously examined by a VA contractor need to be reexamined by the VA to ensure the required standard was upheld. These 51 veterans are being contacted individually and their appointments scheduled at their earliest convenience. VA benefits staff members are standing by to expedite processing of these C&P exams and inform veterans of their benefits for which they may be eligible.[22]

164.   Mr. Murphy was asked by committee member Congresswoman Julia Brownley to explain how the VA would ensure that MDEs performed by contractors are performed using "the same metrics and criteria" as when performed by the government "so that veterans are being treated equitably no matter who performs the exam."   As to the credentials of examiners used by contractors, Mr. Murphy explained the contractors were required to submit DBQs signed by the examiners and listing the examiner's qualifications to demonstrate that particular examiner was properly-credentialled for that particular type of MDE:

> Ms. BROWNLEY. … And in terms of, we have been talking about standardization, and what is the VBA doing to ensure that all of the exams, whether they are conducted at VHA or by a contractor, are being performed accurately, and that the physicians performing the exams are using the same metrics and criteria for reporting so that veterans are being treated equitably no matter who performs the exam?

> Mr. MURPHY. This requires a two-part answer. I can speak specifically to what VBA is doing with our contractors and then there is a whole other side of this that VHA is going to need to discuss. But we have timeliness standards in terms of how much time you need to spend with the veteran as a standard written into the contract. We also have a quality team that samples, measures, monitors. With all of our contractors, they use electronic

---

[22] *VBA and VHA Interactions: Ordering and Conducting Medical Examinations: Hearing Before the H. Comm. on Veterans' Affairs*, 113th Cong. at 7-8 (2014) (statement of Thomas Murphy, Director, Compensation Service, Veterans Benefits Admin.); https://archives-veterans.house.gov/sites/republicans.veterans.house.gov/files/113-77.pdf

systems to complete these DBQs and they have built in some quality steps and measures that **require the blocks that are necessary to be completed to require the signature, license numbers, etcetera, that the doctors need to complete and provide an adequate DBQ for rating purposes**.[23]

165.     Consistent with the above-described testimony, the VA was clear in its dealings with MSLA and other contractors that that there was to be no "sacrifice of quality for efficiency."

166.     The fundamental purpose of MSLA's contracts with the VA was to provide Contract Medical Disability Examinations for the VA and the primary deliverable was "Completed Examination Reports"—reports that were required to be signed by the physician examiner completing the report and that required such examiner to indicate the credentials qualifying the physician to complete the particular MDE report in question.

167.     The VA imposed several requirements on MSLA to ensure that the reports submitted by MSLA satisfied the VA's "clinical requirements and credentialing criteria for both the elements of the exam as well as the clinicians who perform them":

a.     MSLA *was responsible for* locating and subcontracting with properly-credentialled physician examiners to conduct Contract Medical Disability Examinations in response to requests received from the VA Regional Offices.

b.     MSLA was *required* to "ensure that only licensed graduates of an accredited medical school conduct the examinations."

c.     MSLA was *required* to "ensure all examiners have all licenses, permits, accreditation, and certificates required to conduct the examinations."

---

[23] *VBA and VHA Interactions: Ordering and Conducting Medical Examinations: Hearing Before the H. Comm. on Veterans' Affairs*, 113th Cong. at 36 (2014)
https://archives-veterans.house.gov/sites/republicans.veterans.house.gov/files/113-77.pdf

d.      To perform such MDEs for MSLA under the contract, the VA required that all "[e]xaminers' licenses must be clear and unrestricted and in full force and effect in the jurisdiction where examinations will be performed while performing examinations under this contract."

e.      The VA *required* that "[n]o one may be an examiner who is either prohibited from participating in, excluded, suspended, or otherwise barred from participation in the Medicare or Medicaid programs or any other Federal or Federally-assisted program."

f.      The VA *required* that "[n]o one may be an examiner … whose license to provide health care services is currently revoked or suspended by a State licensing authority pursuant to adequate due process procedures for reasons bearing on professional competence, professional conduct, or financial integrity or for such other reasons as may be valid in the licensing jurisdiction."

g.      The VA *required* that "[n]o one may be an examiner … who, until a final determination is made, has surrendered such a license while formal professional disciplinary proceedings are pending."

h.      On a monthly basis, MSLA was *required* to provide an up-to-date status of its subcontractor physician examiners with a statement verifying that all individual licenses and/or credentials of the physicians performing the examinations have not been revoked and that disciplinary proceedings involving professional conduct are not pending.

i.      Prior to the physical examination of the veteran portion of the MDE being performed by the examiner, MSLA was *required* to provide the examiner a copy of the Veteran's medical records that had been provided by the VA (and not just certain records

64

that had been cherry-picked to share with the examiner, for unknown reasons, by MSLA staff).

j.      If the Worksheet for a particular examination *required* the physician examiner to conduct an examination of a Veteran or service member to determine suitability for a particular diagnostic test, then MSLA was *prohibited* from scheduling such diagnostic test prior to the veteran's or service member's examination by the physician examiner.

k.      The VA *required* that "[c]ompleted examination reports shall include an indication of the examiner's credentials (*e.g.* "MD" if performed by Medical Doctor) and signature" and that "[t]he person signing the examination shall have been the person who conducted the examination."

168.    In October of 2018, United States Government Accountability Office submitted a report to the Committee on Veterans' Affairs, House of Representatives entitled *VA Disability Exams: Improved Performance Analysis and Training Oversight Needed for Contracted Exams*.

169.    Regarding "VBA Licensing and Training Requirements for Contracted Examiners," the report noted that: "VBA contracts require that contracted examiners have full, current, valid, and unrestricted licenses, and current and valid State Medical Board certifications, before conducting any exams—the same requirements that apply to VHA medical providers" and that "[a]ccording to agency officials, VBA also requires that contracted examiners complete the same training that VHA providers must take before they can conduct any disability medical exams."[24]

---

[24] U.S. Gen. Accounting Office, GAO-19-13, *VA Disability Exams: Improved Performance Analysis and Training Oversight Needed for Contracted Exams*  7 (2018).

170.    The report noted that "[b]efore awarding the exam contracts, according to VA officials, VA's Contracting Office reviewed all contractors' processes for verifying examiners' licenses."[25]

171.    The report further noted that the VA had contracted with "a third-party auditor who verifies that all active contracted examiners have a current, valid, and unrestricted medical license in the state where they examined a veteran":

> Specifically, the auditor verifies the license numbers of all active contracted examiners in the states where they perform VA disability compensation exams; National Provider Identifiers; and any prior or current sanctions or restrictions resulting in a revoked or suspended license at the time of a VA exam.  In addition, contractors send VBA monthly reports of examiners' medical license, specialty, and accreditation based on the contractors' verification of this information. Every 2 months, VBA sends the auditor a consolidated report of this information covering all five contractors. The auditor verifies examiners' information in that report before sending a final audit report to VBA, noting if the auditor was or was not able to verify examiners' licenses. After reviewing the report, VBA contacts the contractors to gather additional information to resolve any issues, and **in cases in which licensing requirements are not met, VBA stops using the examiner and offers new exams to veterans who have been seen by the examiner**.

> VBA and auditing firm officials noted that audit results show that almost all examiners have current and valid licenses, and **contractors are required to stop using those who do not meet licensing requirements**. VBA and auditing firm officials said that issues identified in the audits are usually due to typos or differences in how information is captured across different licensing databases. However, based on an audit, **VBA provided an example of an examiner with a restricted medical license who had completed exams for one contractor**. In this case, VBA notified the contractor, who then stopped using the examiner and said it was taking action to prevent errors in its license verification process from occurring again. In addition, **the contractor reimbursed VBA for the cost of exams conducted by the examiner** and also offered new exams to veterans who had been seen by the examiner. [26]

172.    As to examiner training requirements, the report noted:

---

[25] U.S. Gen. Accounting Office, GAO-19-13, *VA Disability Exams: Improved Performance Analysis and Training Oversight Needed for Contracted Exams* 23 (2018).

[26] U.S. Gen. Accounting Office, GAO-19-13, *VA Disability Exams: Improved Performance Analysis and Training Oversight Needed for Contracted Exams* 23-24 (2018).

As stated in the latest version of the contracts, **contractors must immediately stop using any examiner found to have not completed required training, notify VBA, and re-examine the involved veterans at no cost to VBA, if requested by the agency**. [27]

173.    As the above items illustrate, the VA did not and would not pay contractors, including MSLA, if the VA was aware that the MDE reports submitted by the contractor were not the product of properly-credentialled medical examiners.  To the contrary, and as discussed above, there is evidence that when the VA did learn of MDE reports not being completed by properly-credentialled medical examiners, the VA required such veteran be examined again—at no cost to the VA—by a properly-credentialled examiner, and/or required the contractor to reimburse the VA amounts paid by the VA to the contractor for reports that were not the product of properly-credentialled medical examiners.

174.    As another example, on April 20, 2017, the Department of Justice announced that David L. Biersmith, the owner and president of Industrial Medical Center, pled guilty to one count of health care fraud and one count of making false statements to a federal agency.

175.    Biersmith had "signed a contract with Logistics Health, Inc., [for IMC] to provide disability examinations for veterans to determine the extent of veterans' impairments and eligibility for benefits." [28]  "The Department of Veteran's Affairs paid Logistics Health $39,155 for the disability examinations performed by its subcontractor, IMC." [29]  However, "IMC [had] falsely represented that a licensed physician had completed and electronically signed the Disability

---

[27] U.S. Gen. Accounting Office, GAO-19-13, *VA Disability Exams: Improved Performance Analysis and Training Oversight Needed for Contracted Exams* 24 (2018).
[28] Press Release, U.S. Dep't of Justice, *Owner of Independence Clinic Pleads Guilty to Health Care Fraud Scheme* (April 20, 2017) https://www.justice.gov/usao-wdmo/pr/owner-independence-clinic-pleads-guilty-health-care-fraud-scheme
[29] Press Release, U.S. Dep't of Justice, *Owner of Independence Clinic Pleads Guilty to Health Care Fraud Scheme* (April 20, 2017) https://www.justice.gov/usao-wdmo/pr/owner-independence-clinic-pleads-guilty-health-care-fraud-scheme

Benefits Questionnaires."[30]  "This was done in violation of Logistic Health's contract with the Department of Veterans Affairs, which required that disability examinations be conducted by credentialled providers and that the examiners must have a clear and unrestricted license and not be excluded from participation in the Medicare or Medicaid programs."[31]

176.    On August 18, 2017, Biersmith was sentenced to 60 months' probation and ordered to pay $39,155.14 in restitution (*i.e.*, the entire amount that had been paid by the VA for the exams at issue).[32]

177.    "In a separate but related case, [Wayne W.] Williamson pleaded guilty on Jan. 17, 2017, to health care fraud."  Williamson, a medical consultant at IMC "was formerly a medical doctor but voluntarily surrendered his medical license in 2010."[33]  "Williamson admitted that he performed disability examinations for the Department of Veterans Affairs under IMC's contract with Logistics Health"  and "[t]his was done in violation of Logistic Health's contract with the Department of Veterans Affairs, which required that disability examinations be conducted by credentialled providers and that the examiners must have a clear and unrestricted license and not be excluded from participation in the Medicare or Medicaid programs."[34] "Williamson was

---

[30] Press Release, U.S. Dep't of Justice, *Owner of Independence Clinic Pleads Guilty to Health Care Fraud Scheme* (April 20, 2017) https://www.justice.gov/usao-wdmo/pr/owner-independence-clinic-pleads-guilty-health-care-fraud-scheme
[31] Press Release, U.S. Dep't of Justice, *Owner of Independence Clinic Pleads Guilty to Health Care Fraud Scheme* (April 20, 2017) https://www.justice.gov/usao-wdmo/pr/owner-independence-clinic-pleads-guilty-health-care-fraud-scheme
[32] Press Release, Office of Inspector General, U.S. Dept. of Transportation, *Missouri Clinic Owner Sentenced for Issuing False Medical Examinations of Commercial Truckers and Veterans* (August 18, 2017) https://www.oig.dot.gov/library-item/35895
[33] Press Release, U.S. Dep't of Justice, *Owner of Independence Clinic Pleads Guilty to Health Care Fraud Scheme* (April 20, 2017) https://www.justice.gov/usao-wdmo/pr/owner-independence-clinic-pleads-guilty-health-care-fraud-scheme
[34] Press Release, U.S. Dep't of Justice, *Owner of Independence Clinic Pleads Guilty to Health Care Fraud Scheme* (April 20, 2017) https://www.justice.gov/usao-wdmo/pr/owner-independence-clinic-pleads-guilty-health-care-fraud-scheme

sentenced to three years in federal prison and permanently excluded from participation in Medicare or Medicaid programs." [35]

178.    The VA *required*—and the VA would have only knowingly paid for—MDEs completed by properly-credentialled physicians.  The VA would not have accepted and paid MSLA for MDEs if the VA had known MSLA attached electronic signatures of licensed physicians to the final reports submitted to the VA (making it appear to the VA that the reports were what the VA required and paid for) even though those physicians had been excluded from, and were unaware of, much of what had transpired at MSLA in order to complete the final reports submitted to the VA.  More specifically, the VA would not have accepted and paid MSLA if the VA had known MSLA's reports misrepresented that the individual whose digital signature was affixed to the report had reviewed the veteran's file and medical records (when in reality the claimant's file and records had been edited by MSLA staff lacking the required credentials prior to being shared with the individual identified on the report as the examiner); misrepresented that the individual whose digital signature was affixed to the report had properly determined tests listed on the report were necessary and had ordered such tests (when in reality tests took place or did not take place based on decisions of MSLA staff lacking the required credentials prior to the veteran even seeing the individual identified on the report as the examiner, without regard to whether the claimants file had yet been reviewed by the individual identified on the report as the examiner, and despite the fact that the full file and records provided by the VA for the MDE would never be made available the individual identified on the report as the examiner); misrepresented that the individual whose digital signature was affixed to the report had reviewed, considered and incorporated all

---

[35] Press Release, U.S. Dep't of Justice, *Owner of Independence Clinic Pleads Guilty to Health Care Fraud Scheme* (April 20, 2017) https://www.justice.gov/usao-wdmo/pr/owner-independence-clinic-pleads-guilty-health-care-fraud-scheme

test results mentioned in the report (when in reality test results were not necessarily even shared by MSLA staff with the individual identified on the report as the examiner); and misrepresented that the individual whose digital signature was affixed to the report knowingly approved and "signed" the final version of the report submitted to the VA (when in reality reports were changed by MSLA staff lacking the required credentials without the knowledge or approval of the individual identified on the report as the examiner).

### IX.    MSLA Fraudulently Induced VA to Award Contracts

179.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

180.    MSLA violated the False Claims Act by fraudulently inducing the VA to award MSLA the contracts to provide medical examinations by: (i) making representations material to the government's decision to award a contract to MSLA to the government; (ii) which were false when made; (iii) made with knowledge the representations were false when made ("knowing" and "knowingly" are defined by 31 U.S.C. § 3729(b)(1)(A)); and, (iv) thereafter making a great many requests for the government to pay out money pursuant to such contract.

181.    To induce the VA to award contracts, MSLA knowingly made material misrepresentations regarding the capacity of its network of properly-credentialled examiners to meet the volume of VA requests and whether it would provide MDEs and reports completed by properly-credentialled examiners as required by the VA.    As explained below, the misrepresentations were material to the VA and the VA would not have awarded the contracts— and would not have sent and continued to send examination requests—to MSLA had MSLA had disclosed the truth.  Moreover, after inducing the VA to award the contracts and send requests for

MDEs, MSLA then submitted false claims under the fraudulently obtained contracts, causing the government to pay out money from the public fisc.

**A.      MSLA fraudulently misrepresented its capacity to perform.**

182.    During the contact solicitation and proposal process, the VA provided would-be contractors with information regarding the nature and volume of examinations expected for each contract district at issue, including particulars about the minimum and maximum estimated volumes for each contract district. This is because the VA required that contractors be able to provide a network of properly-credentialled examiners with sufficient capacity to fulfill VA requests for the exams that were the subject of the contract, since, within 60-90 days of contract award, a contractor would begin receiving requests for medical examinations from the VA.

183.    In its contract proposal submissions to the VA, MSLA misrepresented its capacity to provide a network of properly-credentialled examiners with capacity to fulfill VA requests for MDEs under the contract in order to induce the VA to award contracts to MSLA.  In particular, MSLA (i) falsely referred to "MSLA's *preparedness* and *capacity to handle a large volume of additional examination requests*"; (ii) falsely stated that "MSLA *is prepared* to meet or exceed VA's 60-90 day ramp-up on additional locations if awarded"; (iii) falsely represented that "MSLA *currently* has the necessary resources in place to successfully recruit the adequate numbers of providers to conduct exams in the all [sic] areas covered by the contract"; and, (iv) falsely presented that "MSLA *has the ability* to handle surges where caseloads may double or even triple with short notice."

184.    The reality was that when such representations were made by MLSA (and relied on by the VA to award the contracts and then request examinations), MSLA had actual knowledge—or acted with deliberate ignorance or reckless disregard of the truth regarding the facts—that: (i)

MSLA lacked "preparedness and capacity to handle a large volume of additional examination requests"; (ii) MSLA was not "prepared to meet or exceed VA's 60-90 day ramp-up on additional locations if awarded"; (iii) MSLA did not "currently ha[ve] the necessary resources in place to successfully recruit the adequate numbers of providers to conduct exams in the all [sic] areas covered by the contract"; and, (iv) MSLA did not have "the ability to handle surges where caseloads may double or even triple with short notice."

185.    In reality, MSLA did not have enough provider capacity to satisfy even the normal volume of requests for examinations from the VA under the contract – much less the capacity to handle any *additional* or *surge* requests--and, this was so not only when the representations were made by MLSA, but also (i) *after* an initial 90-day ramp-up period, (ii) *after* an additional 60-day period was provided to MSLA in September 2017, and (iii) even *after* another additional 60-day period was provided to MSLA during which the VA even *reduced* the volume of requests sent to MSLA.   In other words, even with significant additional time and a reduced volume of requests, MSLA still could not keep up.

186.    In short, MSLA *never* had an adequate network of exam providers despite its false representations directly to the contrary.   In fact, more than 8,700 exams that the VA had initially requested from MSLA were eventually canceled (by the VA) and rescheduled through other contractors during what the VA called "the MSLA Cancellation Project." As summarized by the OIG following an investigation:

> "According to the MDE contract, three months of performance data were required before punitive action could be taken. The MSLA contracts provided a 90-day period (ramp-up) to establish necessary resources to meet exam request capacity. According to the contracting officer, in September 2017, VBA provided an additional 60-day extension to assist MSLA in meeting the contractual requirements. VBA also reduced the volume of exam requests sent to MSLA. The contracting officer stated that by November 2017, MSLA still was "not making it," and as a result, was given less work over the next two months to allow the contractor

to "catch up." The MDE and budget deputy executive director also stated that the percentage of exams being sent to MSLA tapered and eventually reduced from 50 percent of the work that was available in MSLA's geographical locations to approximately 20 percent. [...]. By the end of the extended 60-day period, MSLA was still unable to meet the contract requirements. The MDE and budget deputy executive director stated that VBA stopped sending MSLA new exam requests in December 2017." [36]

187.    As summarized by Mr. Scarpiello, MSLA's own Program Manager during the relevant period, in his later lawsuit against MSLA:

"While Defendants MSLA and/or MSLA Mgmt was supposed to have 3,000 vendors by a specified date, they only secured 1,500 such providers by the contractually imposed deadline. ***Rather than disclose*** this issue, Defendants MSLA and/or MSLA Mgmt ***misinformed*** the VA as to their readiness capability."

188.    MSLA's false representations regarding its ability to handle requests from the VA for examinations under the contracts induced the government to award the contracts at issue to MSLA.    As a result of MSLA's false misrepresentations, the VA was misled by MSLA into believing and thus stating that MSLA could "be up and running on day one, minimizing the need for an initial 90 day ramp-up time", and that MSLA had the "ability to quickly ramp up sooner than the 90 days allowed under the RFP (as well as in cases of exam surges)," which the VA "considered a benefit to the feasibility of the offeror's technical approach to exceed minimum requirements under the contract."    However, none of this was true.

189.    MSLA had actual knowledge that it lacked such ability or acted in deliberate ignorance or reckless disregard of the truth or falsity of such representations about such ability. As noted, not only was MSLA ***not*** "up and running on day one" with adequate capacity; MSLA *never* developed adequate capacity (much less capacity to handle *any* sort of "surge")—***not even after*** an initial 90-day ramp-up period, ***or after*** an additional 60-day period was provided to MSLA

---

[36] VA, Office of Inspector General, Report 18-04266-115, *Inadequate Oversight of Contracted Disability Exam Cancellations* (Jun. 10, 2019).

in September 2017, *or after* another additional 60-day period was provided to MSLA during which the VA even *reduced* the volume of requests sent to MSLA.

190.    Having an adequate network of examination providers with capacity to handle requests from the VA was material to the VA's decision to award a contract with MSLA for each such contract district awarded. Indeed, in December 2017, when the VA eventually determined that MSLA did not have an adequate network of examination providers, the VA stopped sending examination requests to MSLA.  However, before that occurred, MSLA had submitted thousands of examination reports to the VA, after which it then submitted requests for payment to (and was paid for them by) the VA)—all pursuant to the contracts MSLA obtained by fraudulently inducing the VA to award them based on MSLA's false representations about its capacity to provide a network of properly-credentialled examiners with capacity to fulfill VA requests for exams under the contract.

**B.    MSLA fraudulently misrepresented it would provide MDEs and reports completed by examiners as required by the VA.**

191.    As previously noted, the fundamental purpose of MSLA's contracts with the VA was to provide Contract Medical Disability Examinations for the VA, with the primary deliverable being "Completed Examination Reports" that were prepared by properly-credentialled examiners pursuant to VA contract requirements for such examinations and reports.  To induce the VA to award contracts, MSLA knowingly misrepresented that it would provide MDEs and reports completed by properly-credentialled examiners pursuant to VA requirements for examinations and reports.

192.    Contrary to representations to the VA that it would provide examinations and reports completed pursuant to VA requirements, MSLA had actual knowledge that it would *not*

74

provide them as required, or, at the very least, acted in deliberate ignorance or reckless disregard of the truth or falsity of its representations that it would provide them as required by the VA.  In particular, a veteran's in-person visit with an examiner is only one part of the MDE that the VA required be performed by properly-credentialled examiners.  An MDE also includes reviewing the veteran's records, ordering and then analyzing results of diagnostic tests, and completing, approving and signing the final report submitted.   In short, the MDEs at issue are unlike a typical medical exam, and should be thought of instead as a forensic medical review and examination. As detailed above in this complaint, an MDE for purposes of the VA's contacts with MSLA and for purposes of the VA's legal obligations to veterans and service-members includes a properly-credentialled examiner: (1) reviewing the veteran's file and records forwarded by the VA for that MDE; (2) conducting an in-person exam; (3) ordering additional tests if necessary and analyzing the results of any such tests; and (4) preparing and signing a report documenting their work.

193.    According to the VA, examiners typically spend more than an hour before or after appointments reviewing claims files to ensure they are providing the most complete and accurate reviews possible.  This is because the properly-credentialled examiner was to be provided all records forwarded by the VA for the claim, which often included the entire claim file (C-file/e-file). In its contract proposal submissions, MSLA misleadingly represented to the VA that all applicable records for a given veteran's examination would be appropriately available to, and reviewed by, the properly-credentialled examiner responsible for that examination and report (as required by the VA).  However, MSLA at that time knew—but misleadingly failed to disclose to the VA—that, in fact, such records would (as detailed above in this complaint) not only first be culled and edited by unqualified and unidentified MSLA staff, but also that MSLA's examiners

would be informed that the time they needed to spend reviewing records had been cut "in half" because they only needed to review the edited portion provided by MSLA.

194.    The VA also required that the properly-credentialled examiner responsible for a given examination and report be the one to determine (a) whether any test and procedures otherwise required by the applicable examination worksheets will not be conducted because it was not medically advisable for that veteran and (b) whether any additional diagnostic test or test were necessary and appropriate to be ordered under the circumstances presented by that veteran and claim. Such determinations can only be properly made by the examiner *after* the examiner has reviewed the veteran's records and, often, only *after* the examiner has also seen the veteran. To get the contract, MSLA misrepresented that it would comply with VA requirements for ordering diagnostic tests. In its contract proposal submissions, MSLA falsely and misleadingly represented that ordering of diagnostic tests for a given veteran's examination would take place "*on examination day*", and as determined *by the examiner*, when MSLA knew, but failed to disclose, that diagnostic tests would (as detailed above in this complaint) be routinely and systemically ordered *not by the examiner*, but instead by MSLA staff lacking the required credentials well before "examination day" (thus ordered not "on examination day", but *before* the veteran ever saw the examiner, and without regard to a proper review of the veteran's existing records by the examiner to determine whether a particular test was necessary or not or was medically advisable or not).

195.    The VA required that properly-credentialled examiners complete the MDEs and reports, and that completed reports include the examiner's credentials, specialty (demonstrating they were properly qualified for the particular MDE and report at hand) and signature in accordance with requirements of the MDE at hand.  The VA's strict qualifications for examiners

would be meaningless if unidentified employees with unknown qualifications could nonetheless add and subtract from reports at will. MSLA misrepresented that its submitted reports would be "completed" by the individual whose credentials and signature would be included with a report.

196. For example, in its contract proposal submissions, MSLA falsely and misleadingly represented that "Provider completes the report in CMS using pin number, *certifying that Provider completes the report*" when MSLA knew, but failed to disclose, that the Provider/examiner identified on the submitted report would (as detailed above in this complaint) be excluded from, and unaware of, much of what transpired at MSLA in order to "complete" the MDE and report in question. In reality, MSLA submitted reports that were "completed" by MSLA employees (as detailed above in this complaint), rather than a properly-credentialled examiner, and sometimes test results were added to reports after the examiner had submitted the examination report to MSLA and concluded his or her work on the case.

197. MSLA's false representations that it would, as required by the VA, provide examinations and reports completed by properly-credentialled examiners (including (1) reviewing the veteran's records forwarded by the VA; (2) conducting a physical exam; (3) ordering additional tests if necessary (and analyzing the results); and (4) preparing and signing a report documenting their work) induced the government to award the contracts at issue to MSLA.

198. As discussed above, that MSLA would provide MDEs that were actually completed by properly-credentialled examiners (as required by the VA) was (as detailed above in this complaint) material to the VA's decision to award a contract with MSLA for each such contract district awarded. The contracts at issue specified that the VA would not pay for MDEs unless performed by examiners that were properly, licensed and trained for the MDE in question. However, MSLA submitted thousands of MDE reports and requests to the VA for payment, and

was paid by the VA, all pursuant to the contracts MSLA obtained by fraudulently inducing the VA to award such contracts based on MSLA's misrepresentations that it would provide MDEs and reports completed by properly-credentialled examiners as required by the VA.

## IX.   Causes of Action

### Count One

### Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

199.   The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

200.   The FCA, 31 U.S.C. § 3729(a)(1)(A) imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval to the United States government. When submission of such false claims are discovered by private citizens, the FCA allows those citizens to bring an action on behalf of the United States against the perpetrators. 31U.S.C. § 3730(b)(1).

201.   Through their conduct, Defendants have knowingly submitted, or caused to be submitted, false claims for payment, as set forth above, in violation of 31 U.S.C. § 3729(a)(1). Specifically, as alleged herein, Defendants have submitted false claims to the VA (*i.e.,* the United States) for payment for MDEs.  In submitting these claims for payment, Defendants represented that MDEs submitted to the VA by Defendants had been, as required by the VA, completed by the properly-credentialled physicians whose electronic signatures and credentials were attached to such MDE reports. In truth, for the reasons described herein, the MDEs reports had not been completed by properly-credentialled physicians. Had the VA known that the MDEs had not been completed by properly-credentialled physicians, the VA/United States never would have paid Defendants for the MDEs.

202.    Defendants also submitted false claims for payment of timeliness and "quality" incentive bonuses.  Defendants represented to the VA/United States that they were entitled to these bonuses when in fact they were not since the reports were completed as quickly as they were only because Defendants prepared the reports without complying with the VA requirements that properly-credentialled physicians decide what records were relevant, review all relevant records, decide what tests to order, review the results of any ordered tests, and prepare and approve the final report.

203.    Defendants' fraudulent conduct described herein was material to the government's decision to pay Defendants for the services billed, the reports provided and the bonuses requested (*i.e.*, the VA would not have authorized payments for the services, reports and bonuses if it had been aware of Defendants' misrepresentations).

204.    Relator has brought this action pursuant to 31 U.S.C. § 3730(b)(1) and provided a Disclosure Statement to the United States in compliance with § 3730(b)(2).

205.    By reason of Defendants' actions, the United States has incurred and continues to incur damages.

206.    Defendants are liable for 3 times the amount of damages which the Government sustained plus a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]) (*see*, 85 Fed. Reg. 37004) for each and every false claim for payment submitted under the contracts.

**Count Two**

**Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**

207.    The preceding factual statements and allegations are incorporated herein by references as if fully set forth herein.

208.    Section 3729(a)(1)(B) of the FCA imposes liability upon those who make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim to the United States government. See 31 U.S.C. § 3729(a)(1)(B).

209.    Through their conduct, Defendants have made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as set forth above, in violation of 31 U.S.C. § 3729(a)(1)(B).

210.    More specifically, as alleged herein, the false records or statements used or made by Defendants were MDE reports submitted to the VA and for which payment was requested by Defendants.  The reports misrepresented that the examiner whose digital signature was affixed to the report had reviewed the veteran's file and medical records; misrepresented that the examiner whose digital signature was affixed to the report had properly determined tests listed on the report were necessary; misrepresented that the examiner whose digital signature affixed to the report had ordered the tests conducted in connection with the MDE; misrepresented that the examiner whose digital signature was affixed to the report had reviewed, considered and incorporated all test results mentioned in the report; and misrepresented that the examiner whose digital signature was affixed to the report knowingly approved and "signed" the final version of the report submitted to the VA. Instead, much of this work was done by MSLA employees who lacked the necessary credentials (including unlicensed international medical graduates) whose involvement and credentials were not disclosed to the VA and whose involvement was primarily motivated by MSLA's desire to move claims along quickly enough to meet timeliness requirements for payment and to qualify for time-related bonus incentive payments for MSLA from the VA.  Defendants knew the reports were

false but Defendants submitted them anyway to the VA/United States and then requested and received payment for the false reports (as well as for performance bonuses) to which Defendants were not entitled.

211.    Defendants' fraudulent conduct described herein was material to the government's decision to pay Defendants for the services billed, the reports provided and the bonuses requested (i.e., the VA would not have authorized payments for the services, reports and bonuses if it had been aware of Defendants' fraud).

212.    Relator has brought this action pursuant to 31 U.S.C. § 3730(b)(1) and provided a Disclosure Statement to the United States in compliance with § 3730(b)(2).

213.    By reason of Defendants' actions, the United States has incurred and continues to incur damages.

214.    Defendants are liable for 3 times the amount of damages which the Government sustained plus a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]) (*see*, 85 Fed. Reg. 37004) for each and every false record or statement material to a false or fraudulent claim to the United States government.

## Count Three

### Violation of the Federal False Claims Act

### By Fraud in the Inducement

215.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

216.    The False Claims Act "is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co*., 390 U.S.

228, 232 (1968). The principles embodied in this broad construction recognize that promissory fraud (fraud in the inducement) attaches False Claims Act liability to claims for payment that are not explicitly or independently false. *U.S. ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1171 (9th Cir. 2006). "[L]iability will attach to each claim submitted to the government under a contract, when the contractor extension of government benefit was originally obtained through false statements or fraudulent conduct." *Id.*

217.     MSLA violated the False Claims Act by fraudulently inducing the VA to award MSLA the contracts by misrepresenting the capacity of its network of properly-credentialled examiners to meet the volume of VA requests.  MSLA had actual knowledge that its representations regarding capacity to perform were false or, at the very least, MSLA acted with deliberate ignorance or in reckless disregard of the truth or falsity of such representations.  Such misrepresentations were material to the VA's decision to award the contracts, and the VA relied on MSLA's representations as to capacity to perform when awarding such contracts to MSLA.  Then, after inducing the VA to award the contracts and send requests for MDEs, MSLA then submitted false claims for payment under the fraudulently obtained contracts, causing the government to pay out money from the public fisc.  Because the underlying contracts were obtained through MSLA's fraud, MSLA is liable under the False Claims Act for each claim for payment submitted under the contract.

218.     MSLA violated the False Claims Act by fraudulently inducing the VA to award MSLA the contracts by misrepresenting that it would, as required by the VA, provide MDEs and reports completed by properly-credentialled examiners (including (1) reviewing the veteran's records forwarded by the VA; (2) conducting a physical exam; (3) ordering additional tests if necessary (and analyzing the results); and (4) preparing and signing a report documenting their

work).   MSLA had actual knowledge that its representations that it would provide MDEs by properly-credentialled examiners as required by the VA were false or, at the very least, MSLA acted with deliberate ignorance or in reckless disregard of the truth or falsity of such representations.   Such misrepresentations were material to the VA's decision to award the contracts, and the VA relied on MSLA's representations that it would, provide MDEs by properly-credentialled examiners as required by the VA when awarding such contracts to MSLA.   Then, after inducing the VA to award the contracts and send requests for MDEs, MSLA then submitted false claims for payment under the fraudulently obtained contracts, causing the government to pay out money from the public fisc.  Because the underlying contracts were obtained through MSLA's fraud, MSLA is liable under the False Claims Act for each claim for payment submitted under the contract.

219.   Relator has brought this action pursuant to 31 U.S.C. § 3730(b)(1) and provided a Disclosure Statement to the United States in compliance with § 3730(b)(2).

220.   By reason of Defendants' actions, the United States has incurred and continues to incur damages.

221.   Defendants are liable for 3 times the amount of damages which the Government sustained plus a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]) (*see*, 85 Fed. Reg. 37004) for each and every claim for payment submitted under the contracts which Defendants obtained through fraudulent inducement.

## X.   Demand for Jury Trial

222.   Relator expressly demands a trial by jury.

## XI. Prayer for Relief

WHEREFORE, Relator, on behalf of himself, and the United States requests that this Court:

Enter judgment that Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims or otherwise violating 31 U.S.C. §§ 3729-3733;

Enter judgment against each Defendant in an amount equal to three times the damages the United States has sustained as a result of each and all of Defendants' false claims and their wrongful conduct described herein, as well as a civil penalty against each Defendant of $11,000 for each violation of 31 U.S.C. § 3729;

Find joint and several liability against Defendants pursuant to 31 U.S.C. § 3729;

Award Relator the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

Award Relator all costs and expenses of this action, including court costs, expert fees, and all attorneys' fees incurred by Relator in prosecution of this action; and

The United States and Relator be granted each other and further relief to which they may show themselves to be justly entitled.

Dated:  December 10, 2021

Respectfully submitted,

/s/ James Craig Orr, Jr.
James Craig Orr, Jr. (*pro hac vice*)
Charles Miller, SBN 276523
**HEYGOOD, ORR & PEARSON**
6363 North State Highway 161
Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002

**ATTORNEYS FOR PLAINTIF**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28